# Exhibit A


## Service of Process Transmittal Summary

**TO:**   WILL JOSLIN, Assistant General Counsel & Assistant S
Gray Television, Inc.
445 DEXTER AVE STE 7000
MONTGOMERY, AL 36104-3892

**RE:**   **Process Served in North Carolina**

**FOR:**   Gray Local Media, Inc.  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | DR. RAMESH K. SUNAR, DMD vs. GRAY LOCAL MEDIA, INC. |
| **CASE #:** | 25CV067844590 |
| **PROCESS SERVED ON:** | C T Corporation System, Raleigh, NC |
| **DATE/METHOD OF SERVICE:** | By Process Server on 01/20/2026 at 16:27 |
| **JURISDICTION SERVED:** | North Carolina |
| **ACTION ITEMS:** | CT will retain the current log |
| | Image SOP |
| | Email Notification,  Ellenann Yelverton  ellenann.yelverton@gray.tv |
| | Email Notification,  WILL JOSLIN  will.joslin@graymedia.com |
| | Email Notification,  Debbie Trotter  debbie.trotter@gray.tv |
| **REGISTERED AGENT CONTACT:** | C T Corporation System |
| | 160 Mine Lake CT, Suite 200 |
| | Raleigh, NC 27615 |
| | 866-401-8252 |
| | LargeCorporationTeam@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.


**Wolters Kluwer**

# PROCESS SERVER DELIVERY DETAILS

| | |
|---|---|
| **Date:** | Tue, Jan 20, 2026 |
| **Server Name:** | Drop Service |

| | |
|---|---|
| Entity Served | GRAY LOCAL MEDIA, INC. |
| Case Number | 25CV067844-590 |
| Jurisdiction | NC |

| Inserts | | |
|---|---|---|
| | | |



# STATE OF NORTH CAROLINA

_____Mecklenburg_____ County

File No. 25CV067844-590

In The General Court Of Justice
☐ District  ☐ Superior Court Division

**CIVIL SUMMONS**
☐ ALIAS AND PLURIES SUMMONS (ASSESS FEE)

G.S. 1A-1, Rules 3 and 4

| | |
|---|---|
| *Name Of Plaintiff*<br>Dr. Ramesh K. Sunar | |
| *Address*<br>2809 Coltsgate Road, Ste. 210 | |
| *City, State, Zip*<br>Charlotte, NC 28211 | |

**VERSUS**

| | |
|---|---|
| *Name Of Defendant(s)*<br>Gray Television, InC<br>C/O CT Corporation System (Registered Agent)<br><br>150 Fayetteville Street, Ste. 1900<br>Raleigh, NC 27601 | *Date Original Summons Issued*<br><br>*Date(s) Subsequent Summons(es) Issued* |

## To Each Of The Defendant(s) Named Below:

| *Name And Address Of Defendant 1*<br>Gray Local Media, Inc., d/b/a WBTV<br>C/O CT Corporation System (Registered Agent)<br><br>160 Mine Lake Ct<br>Ste 206<br>Raleigh NC 27615 | *Name And Address Of Defendant 2*<br>Gray Television, InC<br>c/o ct corporation system (registered agent)<br>150 Fayetteville street, ste. 1900<br>raleigh, NC 27601 |
|---|---|

ued! These papers are legal documents, DO NOT throw these papers out!
days. You may want to talk with a lawyer about your case as soon as
k with someone who reads English and can translate these papers!

do un proceso civil en su contra! Estos papeles son documentos legales.
tos papeles!
**Tiene que contestar a más tardar en 30 días. ¡Puede querer consultar con un abogado lo antes posible acerca de su caso y, de ser necesario, hablar con alguien que lea inglés y que pueda traducir estos documentos!**

**A Civil Action Has Been Commenced Against You!**

You are notified to appear and answer the complaint of the plaintiff as follows:

1. Serve a copy of your written answer to the complaint upon the plaintiff or plaintiff's attorney within thirty (30) days after you have been served. You may serve your answer by delivering a copy to the plaintiff or by mailing it to the plaintiff's last known address, and

2. File the original of the written answer with the Clerk of Superior Court of the county named above.

If you fail to answer the complaint, the plaintiff will apply to the Court for the relief demanded in the complaint.

| *Name And Address Of Plaintiff's Attorney (If none, Address Of Plaintiff)*<br>Dr. Ramesh K. Sunar<br>2809 Colgate Road, Ste. 210<br>Charlotte, NC 28211 | *Date Issued*<br>12/17/2025 | *Time*<br>4:00 ☐ AM ☒ PM |
|---|---|---|
| | *Signature*<br>**Harvey Frison** | |
| | ☒ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

| ☐ **ENDORSEMENT (ASSESS FEE)**<br>This Summons was originally issued on the date indicated above and returned not served. At the request of the plaintiff, the time within which this Summons must be served is extended sixty (60) days. | *Date Of Endorsement* | *Time*<br>☐ AM ☐ PM |
|---|---|---|
| | *Signature* | |
| | ☐ Deputy CSC ☐ Assistant CSC ☐ Clerk Of Superior Court | |

**NOTE TO PARTIES:** *Many counties have MANDATORY ARBITRATION programs in which most cases where the amount in controversy is $25,000 or less are heard by an arbitrator before a trial. The parties will be notified if this case is assigned for mandatory arbitration, and, if so, what procedure is to be followed.*

(Over)

AOC-CV-100, Rev. 12/23
© 2023 Administrative Office of the Courts

## RETURN OF SERVICE

I certify that this Summons and a copy of the complaint were received and served as follows:

### DEFENDANT 1

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

> *Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 1. ☐ Other: *(typo or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

### DEFENDANT 2

| Date Served | Time Served | ☐ AM ☐ PM | Name Of Defendant |
|---|---|---|---|

☐ By delivering to the defendant named above a copy of the summons and complaint.

☐ By leaving a copy of the summons and complaint at the dwelling house or usual place of abode of the defendant named above with a person of suitable age and discretion then residing therein.

☐ As the defendant is a corporation, service was effected by delivering a copy of the summons and complaint to the person named below.

> *Name And Address Of Person With Whom Copies Left (if corporation, give title of person copies left with)*

| ☐ Acceptance of service. Summons and complaint received by: ☐ Defendant 2. ☐ Other: *(type or print name)* | Date Accepted | Signature |
|---|---|---|

☐ Other manner of service *(specify)*

☐ Defendant WAS NOT served for the following reason:

| Service Fee Paid $ | Signature Of Deputy Sheriff Making Return |
|---|---|
| Date Received  DEC 3 1 2025 | Name Of Sheriff (type or print)  W  WILLIE L. ROWE, SHERIFF |
| Date Of Return | County Of Sheriff |

AOC-CV-100, Side Two, Rev. 12/23
© 2023 Administrative Office of the Courts

STATE OF NORTH CAROLINA MECKLENBURG COUNTY | File No. | 25CV067844-590
Mecklenburg County | CLERK OF SUPERIOR COURT
BY: H. Frison | In The General Court Of Justice

| Name And Address Of Plaintiff | |
| Dr. Ramesh K. Sunar | |
| 2809 Coltsgate Road | |
| Ste. 210 | |
| Charlotte, NC 28211 | **SERVICEMEMBERS CIVIL RELIEF ACT** |

**VERSUS**

| Name And Address Of Defendant | |
| Gray Television, Inc | **DECLARATION** |
| C/O CT Coporation System (Registered Agent) | |
| 150 Fayetteville Street, Ste. 1900 | |
| Raleigh, NC 27601 | G.S. Ch. 127B, Art. 4; 50 U.S.C. 3901 to 4043 |

**NOTE:** *Though this form may be used in a Chapter 45 Foreclosure action, it is not a substitute for the certification that may be required by G.S. 45-21.12A.*

## DECLARATION

I, the undersigned Declarant, under penalty of perjury declare the following to be true:

1. As of the current date: *(check one of the following)*
   - ☐ a. I have personal knowledge that the defendant named above is in military service.*
   - ☐ b. I have personal knowledge that the defendant named above is **not** in military service.*
   - ☒ c. I am unable to determine whether the defendant named above is in military service.*
2. As of the current date, I ☐ have ☐ have not received a copy of a military order from the defendant named above relating to State active duty as a member of the North Carolina National Guard or service similar to State active duty as a member of the National Guard of another state. *See* G.S. 127B-27 and G.S. 127B-28(b).
3. I ☐ used ☐ did not use the Servicemembers Civil Relief Act Website (https://scra.dmdc.osd.mil/) to determine the defendant's federal military service.
   - ☐ The results from my use of that website are attached.
   **(NOTE:** *The Servicemembers Civil Relief Act Website is a website maintained by the Department of Defense (DoD). If DoD security certificates are not installed on your computer, you may experience security alerts from your internet browser when you attempt to access the website. Members of the North Carolina National Guard under an order of the Governor of this State and members of the National Guard of another state under an order of the governor of that state will not appear in the SCRA Website database.)*
4. The following facts support my statement as to the defendant's military service: *(State how you know the defendant is or is not in the military. Be specific.)*
   Facts supporting Statement: "The defendant is a corporate entity. Military service applies to individuals, and I cannot determine the status of the individuals associated with this corporation."

**\*NOTE:** *The term "military service" includes the following: active duty service as a member of the United States Army, Navy, Air Force, Marine Corps, Space Force, or Coast Guard; service as a member of the National Guard under a call to active service authorized by the President or the Secretary of Defense for a period of more than 30 consecutive days for purposes of responding to a national emergency; active service as a commissioned officer of the Public Health Service or of the National Oceanic and Atmospheric Administration; any period of service during which a servicemember is absent from duty on account of sickness, wounds, leave, or other lawful cause. 50 U.S.C. 3911(2). The term "military service" also includes the following: State active duty as a member of the North Carolina National Guard under an order of the Governor pursuant to Chapter 127A of the General Statutes, for a period of more than 30 consecutive days; service as a member of the National Guard of another state who resides in North Carolina and is under an order of the governor of that state that is similar to State active duty, for a period of more than 30 consecutive days. G.S. 127B-27(3) and G.S. 127B-27(4).*

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct.

| Date | Signature Of Declarant | Name Of Declarant (type or print) |
| 12/17/2025 | *Ramesh K. Sunar* | Dr. Ramesh K. Sunar |

**NOTE TO COURT:** *Do not proceed to enter judgment in a non-criminal case in which the defendant has not made an appearance until a Servicemembers Civil Relief Act affidavit or declaration (whether on this form or not) has been filed, and if it appears that the defendant is in military service, do not proceed to enter judgment until such time that you have appointed an attorney to represent him or her.*

*(Over)*

AOC-G-250, Rev. 4/24
© 2024 Administrative Office of the Courts

# Information About Servicemembers Civil Relief Act Affidavits And Declarations

## 1. Plaintiff to file affidavit/declaration
In any civil action or proceeding, including any child custody proceeding, in which the defendant does not make an appearance, the court, before entering judgment for the plaintiff, shall require the plaintiff to file with the court an affidavit—
- (A) stating whether or not the defendant is in military service and showing necessary facts to support the affidavit; or
- (B) if the plaintiff is unable to determine whether or not the defendant is in military service, stating that the plaintiff is unable to determine whether or not the defendant is in military service.

50 U.S.C. 3931(b)(1).

## 2. Appointment of attorney to represent defendant in military service
If in a civil action or proceeding in which the defendant does not make an appearance it appears that the defendant is in military service, the court may not enter a judgment until after the court appoints an attorney to represent the defendant. If an attorney appointed to represent a service member cannot locate the service member, actions by the attorney in the case shall not waive any defense of the service member or otherwise bind the service member. 50 U.S.C. 3931(b)(2). State funds are not available to pay attorneys appointed pursuant to the Servicemembers Civil Relief Act. To comply with the federal Violence Against Women Act and in consideration of G.S. 50B-2(a), 50C-2(b), and 50D-2(b), plaintiffs in Chapter 50B, Chapter 50C, and Chapter 50D proceedings should not be required to pay the costs of attorneys appointed pursuant to the Servicemembers Civil Relief Act. Plaintiffs in other types of actions and proceedings may be required to pay the costs of attorneys appointed pursuant to the Servicemembers Civil Relief Act. The allowance or disallowance of the ordering of costs will require a case-specific analysis.

## 3. Defendant's military status not ascertained by affidavit/declaration
If based upon the affidavits filed in such an action, the court is unable to determine whether the defendant is in military service, the court, before entering judgment, may require the plaintiff to file a bond in an amount approved by the court. If the defendant is later found to be in military service, the bond shall be available to indemnify the defendant against any loss or damage the defendant may suffer by reason of any judgment for the plaintiff against the defendant, should the judgment be set aside in whole or in part. The bond shall remain in effect until expiration of the time for appeal and setting aside of a judgment under applicable Federal or State law or regulation or under any applicable ordinance of a political subdivision of a State. The court may issue such orders or enter such judgments as the court determines necessary to protect the rights of the defendant under this Act. 50 U.S.C. 3931(b)(3).

## 4. Satisfaction of requirement for affidavit/declaration
The requirement for an affidavit above may be satisfied by a statement, declaration, verification, or certificate, in writing, subscribed and certified or declared to be true under penalty of perjury. 50 U.S.C. 3931(b)(4). The presiding judicial official will determine whether the submitted affidavit is sufficient.

## 5. Penalty for making or using false affidavit/declaration
A person who makes or uses an affidavit permitted under 50 U.S.C. 3931(b) (or a statement, declaration, verification, or certificate as authorized under 50 U.S.C. 3931(b)(4)) knowing it to be false, shall be fined as provided in title 18, United States Code, or imprisoned for not more than one year, or both. 50 U.S.C. 3931(c).

AOC-G-250, Side Two, Rev. 4/24
© 2024 Administrative Office of the Courts

STATE OF NORTH CAROLINA          IN THE GENERAL COURT OF JUSTICE

MECKLENBURG COUNTY              SUPERIOR COURT DIVISION

FILE NO. 25C V067844-590

FILED
DATE: December 17, 2025
TIME: 4:02:55 PM
MECKLENBURG COUNTY
CLERK OF SUPERIOR COURT
BY: H. Frison

DR. RAMESH K. SUNAR, DMD,

      Plaintiff,


v.                              COMPLAINT AND DEMAND FOR

                        JURY TRIAL

GRAY LOCAL MEDIA, INC.,

d/b/a WBTV, and

GRAY TELEVISION, INC.,

      Defendants.


## I. NATURE OF ACTION

1. This is an action for defamation per se, violation of North Carolina expungement rights, false light invasion of privacy, intentional and negligent infliction of emotional distress, and tortious interference with business relations arising from Defendants' publication and continued republication of false and defamatory statements about Plaintiff across multiple television stations in their network.

2. Plaintiff is a Charlotte dentist who was falsely accused of crimes in September 2024. All charges were voluntarily dismissed by the District Attorney on April 7, 2025, and all records were expunged by court order on October 10, 2025.

3. Under North Carolina General Statute § 15A-145, expunged charges are "deemed never to have occurred" as a matter of law.

4. Despite being provided with proof of expungement, Defendants refuse to remove defamatory publications from multiple stations across their television network and continue to publish false statements about legally non-existent criminal charges.

5. Defendants published defamatory content about Plaintiff not only through WBTV in Charlotte, North Carolina, but also through WIS TV in Columbia, South Carolina, demonstrating a coordinated, corporate-wide publication strategy directed by Defendant Gray Television, Inc.

6. Defendants' network-wide publications have destroyed Plaintiff's thirty-year professional reputation, caused him to lose millions of dollars in business opportunities, prevented him from hiring professional staff, destroyed a $1.7 million business investment, and caused severe mental health harm.

7. Plaintiff seeks compensatory damages of Sixty-Five Million Dollars ($65,000,000) and punitive damages of Fifteen Million Dollars ($15,000,000), for a total of Eighty Million Dollars ($80,000,000), together with interest, costs, and such other relief as the Court deems just and proper.

## II. PARTIES

8. Plaintiff Dr. Ramesh K. Sunar, DMD ("Dr. Sunar" or "Plaintiff") is a resident and citizen of Mecklenburg County, North Carolina, residing at 2809 Coltsgate Road, Suite 210, Charlotte, North Carolina 28211.

9. Plaintiff is a licensed dentist in the State of North Carolina, holding license number NC7293

10. Plaintiff owns and operates Ramesh K. Sunar, DMD, PLLC, doing business as Charlotte Root Canal/Dental Implant Center, with offices located at 2809 Coltsgate Road, Suite 210, Charlotte, North Carolina 28211.

11. Plaintiff graduated from the University of Connecticut School of Dental Medicine in 1998 and completed a specialty residency in Endodontics at New York University in 2001.

12. Plaintiff has operated his dental practice in Charlotte, North Carolina since 2002, serving the community for twenty-three (23) years and building a reputation as a skilled and ethical dental professional specializing in dental implants.

13. Plaintiff is sixty (60) years old.

14. Plaintiff is the father of twin daughters, age seven (7) years.

15. Defendant Gray Local Media, Inc., d/b/a WBTV ("WBTV" or "Defendant WBTV") is a North Carolina corporation with its principal place of business located at 1 Julian Price Place, Charlotte, North Carolina 28208.

16. Upon information and belief, WBTV may be served through its registered agent: CT Corporation System, 150 Fayetteville Street, Suite 1900, Raleigh, North Carolina 27601.

17. WBTV operates a television station in Charlotte, North Carolina, broadcasting on Channel 3, and maintains an online news website at www.wbtv.com.

18. WBTV is one of the largest and most-watched television news stations in the Charlotte metropolitan area, with broadcasts reaching hundreds of thousands of viewers.

19. Defendant Gray Television, Inc. ("Gray Television" or "Defendant Gray") is a Georgia corporation with its principal place of business located at 4370 Peachtree Road NE, Atlanta, Georgia 30319.

20. Upon information and belief, Gray Television may be served through its registered agent in North Carolina: CT Corporation System, 150 Fayetteville Street, Suite 1900, Raleigh, North Carolina 27601.

21. Gray Television is a publicly traded company (NYSE: GTN) and one of the largest owners and operators of television stations in the United States.

22. Upon information and belief, Gray Television has a market capitalization exceeding Four Billion Dollars ($4,000,000,000) and annual revenue exceeding Three Billion Dollars ($3,000,000,000).

23. Gray Television owns and controls WBTV, WIS TV in Columbia, South Carolina, and numerous other television stations across the United States.

24. Gray Television is responsible for the policies, practices, and conduct of WBTV, WIS TV, and its other owned and operated stations.

25. At all times relevant to this action, Defendants acted through their agents, employees, and representatives within the scope of their employment and authority.


## III. JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction over this action pursuant to N.C. Gen. Stat. § 7A-24.0 et seq., as Plaintiff seeks damages exceeding Twenty-Five Thousand Dollars ($25,000).

27. This Court has personal jurisdiction over Defendant WBTV because WBTV maintains its principal place of business in Mecklenburg County, North Carolina, conducts substantial and continuous business activities in Mecklenburg County, and committed the tortious acts complained of in Mecklenburg County, North Carolina.

28. This Court has personal jurisdiction over Defendant Gray Television because Gray Television conducts substantial and continuous business activities in North Carolina through its ownership and operation of WBTV, derives substantial revenue from North Carolina, purposefully avails itself of the privilege of conducting business in North Carolina, and committed tortious acts in North Carolina that caused injury to a North Carolina resident.

29. Venue is proper in Mecklenburg County pursuant to N.C. Gen. Stat. § 1-82, as Defendants maintain a place of business in Mecklenburg County, the causes of action arose in Mecklenburg County, and Plaintiff resides and operates his business in Mecklenburg County.

## IV. FACTUAL BACKGROUND

### A. Dr. Sunar's Career and Reputation (1998-2024)

30. Dr. Sunar has dedicated his professional life to the practice of dentistry and to serving the Charlotte community.

31. After graduating from dental school in 1998 and completing his specialty training in 2001, Dr. Sunar established his dental practice in Charlotte in 2002.

32. Over the course of twenty-three (23) years in practice, Dr. Sunar built a successful dental practice specializing in Endodontics and Dental Implants, earning the trust and respect of thousands of patients and referring dentists throughout the Charlotte metropolitan area.

33. Dr. Sunar invested hundreds of thousands of dollars in advanced training, state-of-the-art equipment, skilled staff, and marketing to build his practice into a thriving business known for providing high-quality dental implant services.

34. Prior to September 2024, Dr. Sunar maintained an exemplary professional reputation with no history of violation of any Dental Practice Acts, no malpractice judgments, and no criminal record of any kind.

35. Dr. Sunar's practice generated substantial annual revenue, employed multiple staff members, and received regular referrals from general dentists throughout the Charlotte area who trusted Dr. Sunar to care for their patients.

36. Dr. Sunar's professional reputation was his most valuable asset and the foundation of his livelihood.

### B. The False Accusations (September 2024)

37. On or about September 11, 2024, the mother of Dr. Sunar's twin daughters made false accusations against Dr. Sunar to law enforcement, alleging misdemeanor child abuse and communicating threats.

38. The accuser is the mother of Dr. Sunar's seven-year-old twin daughters.

39. The accuser has a well-documented history and pattern of making false accusations against multiple individuals, including her own parents, a former romantic partner in 2018, and others.

40. The accuser's own attorneys previously withdrew from representing her in civil matters and attempted to file suit against her due to her conduct.

41. Based solely on the uncorroborated and false allegations of the accuser, Dr. Sunar was arrested on or about September 11, 2024.

42. Dr. Sunar was charged with two misdemeanor offenses in Mecklenburg County District Court:

a. Misdemeanor child abuse (File No. 24CR704170-5710), alleged offense date September 2, 2024; and

b. Communicating threats (File No. 24CR704170-5710), alleged offense date September 2, 2024.

43. Dr. Sunar has never committed child abuse.

44. Dr. Sunar has never communicated threats to any person.

45. The accusations were entirely fabricated and false.

46. Dr. Sunar was released from custody and immediately retained legal counsel to defend against the false charges.

**C. Defendants' Coordinated Multi-Platform, Multi-Station Attack (September 12, 2024)**

47. On September 12, 2024, one day after the false accusations were made and the day Plaintiff was arrested, WBTV published a news article on its website (www.wbtv.com) with the headline: "Charlotte dentist charged with child abuse, records show."

48. The article was published without any independent investigation by WBTV into the veracity of the accusations.

49. The article was published without any attempt by WBTV to contact Dr. Sunar or his counsel for comment or response.

50. The WBTV article prominently featured:

a. Dr. Sunar's full name: "Ramesh K. Sunar";

b. Dr. Sunar's business name: "Charlotte Dental Implant Center";

c. Dr. Sunar's business address: "2809 Coltsgate Road, Suite 210, Charlotte, NC 28211";

d. Dr. Sunar's photograph;

e. Dr. Sunar's booking photograph ("mugshot"); and

f. Details of the accusations.

51. On the evening of September 12, 2024, WBTV broadcast a news segment about Dr. Sunar's arrest during its prime-time 6:00 PM news broadcast.

52. The 6:00 PM news broadcast is one of WBTV's highest-rated programs and is viewed by approximately one hundred thousand (100,000) or more viewers in the Charlotte metropolitan area.

53. The broadcast featured visual display of Dr. Sunar's name, his mugshot, his business name, and details of the accusations against him.

54. The broadcast was narrated by WBTV news anchors and reporters who presented the accusations as fact.

55. On or about September 12, 2024, WBTV published multiple posts on its Facebook page about Dr. Sunar's arrest, including posts that prominently displayed his mugshot and linked to the website article.

56. WBTV's Facebook page has tens of thousands of followers.

57. WBTV's Facebook posts about Dr. Sunar were viewed, shared, liked, and commented upon by thousands of people.

58. On or about September 12, 2024, WBTV published posts on Twitter/X and potentially other social media platforms about Dr. Sunar's arrest.

59. On the same day, September 12, 2024, Defendant Gray Television, Inc. also caused a substantially similar article to be published on WIS TV, a television station in Columbia, South Carolina owned and operated by Gray Television, Inc.

60. The WIS TV article was published on the WIS TV website at http://www.wistv.com/vude/2024/09/12/charlotte-dentist-charged-child-abuse-records-show/ with the identical headline: "Charlotte dentist charged with child abuse, records show."

61. The WIS TV article featured Plaintiff's name, photograph, mugshot, and details of the false accusations, in substantially similar form to the WBTV article.

62. The simultaneous publication on September 12, 2024 of articles with identical headlines on both WBTV (Charlotte, North Carolina) and WIS TV (Columbia, South Carolina) demonstrates that the decision to publish was made at the corporate level by Defendant Gray Television, Inc., and was coordinated across multiple stations in Defendants' network.

63. The WIS TV article reached viewers in South Carolina and surrounding areas, further expanding the geographic reach and scope of Defendants' defamatory publications beyond the Charlotte metropolitan area.

64. Upon information and belief, Defendants may have published substantially similar defamatory content about Plaintiff on additional Gray Television-owned stations beyond WBTV and WIS TV.

65. Defendants' multi-platform publication strategy (website articles, television broadcasts, Facebook, Twitter/X, and other platforms) across multiple stations in multiple states was designed to maximize viewership, website traffic, social media engagement, and advertising revenue.

66. Defendants' prominent use of Dr. Sunar's mugshot across multiple platforms and multiple stations was designed to create maximum visual impact and to associate Dr. Sunar with criminality in the minds of viewers across a broad geographic area.

67. Defendants' publications were motivated by commercial interests, including advertising revenue, television ratings, website page views, and social media engagement metrics.

68. Defendants' network-wide publications were seen by hundreds of thousands of people in North Carolina, South Carolina, and beyond, including Dr. Sunar's patients, referring dentists, potential employees, business associates, friends, family members, and the general public.

69. Defendants' publications had the intended effect: massive public attention, high television ratings, substantial website traffic, and significant social media engagement across multiple markets.

70. Defendants profited financially from their publications about Dr. Sunar through increased advertising revenue resulting from higher ratings and web traffic across their network.

D. The Immediate and Devastating Impact

71. The impact of Defendants' network-wide publications on Dr. Sunar's life and livelihood was immediate, severe, and devastating.

72. Within days of Defendants' publications, Dr. Sunar's dental practice was thrown into crisis.

73. Existing patients began canceling appointments in large numbers, stating that they had seen WBTV's broadcasts or read WBTV's or WIS TV's articles and no longer trusted Dr. Sunar to provide dental care.

74. New patient inquiries and appointments dropped precipitously.

75. Referring dentists throughout the Charlotte area stopped sending referral patients to Dr. Sunar's practice.

76. Dr. Sunar's staff members expressed fear, concern, and uncertainty about their continued employment.

77. Dr. Sunar's practice revenue collapsed by approximately seventy percent (70%) or more.

78. Dr. Sunar received hostile, threatening, and harassing communications from members of the public who had seen Defendants' broadcasts and publications and believed Dr. Sunar was guilty of child abuse.

79. Dr. Sunar's personal relationships were severely damaged as friends, acquaintances, and community members distanced themselves from him.

80. Dr. Sunar suffered immediate and severe emotional distress, including depression, anxiety, humiliation, shame, and psychological trauma.

81. Dr. Sunar experienced difficulty sleeping, loss of appetite, inability to concentrate, crying spells, and other symptoms of severe emotional distress.

82. Dr. Sunar sought medical treatment for depression and anxiety and was prescribed medication.

83. Dr. Sunar contemplated suicide due to the overwhelming destruction of his professional reputation, his practice, and his life.

84. Dr. Sunar's relationship with his twin daughters was negatively impacted as he struggled with the stress, anxiety, and emotional turmoil caused by Defendants' publications.

85. Dr. Sunar lived in constant fear that his daughters would learn about Defendants' accusations.

**E. Voluntary Dismissal of All Charges (April 7, 2025)**

86. Dr. Sunar vigorously defended against the false charges with the assistance of legal counsel.

87. On April 7, 2025, after investigation and review, the Mecklenburg County District Attorney's Office voluntarily dismissed all charges against Dr. Sunar.

88. The dismissal was not the result of any plea agreement, deferred prosecution agreement, or admission of any wrongdoing by Dr. Sunar.

89. The charges were dismissed because they were false and unsupported by credible evidence.

90. Dr. Sunar was completely and totally exonerated.

91. The dismissal confirmed what Dr. Sunar had maintained from the beginning: he was innocent and the accusations were false.

**F. Expungement of All Records (October 10, 2025)**

92. Following the dismissal of all charges, Dr. Sunar petitioned the Mecklenburg County Superior Court for expungement of all records related to his arrest and the dismissed charges pursuant to North Carolina General Statute § 15A-146(a).

93. On May 5, 2025, Dr. Sunar filed his Petition for Expunction Under G.S. 15A-146(a) in Mecklenburg County Superior Court.

94. On October 10, 2025, the Honorable Judge C. Oseguera of the Mecklenburg County Superior Court granted Dr. Sunar's petition and entered an Order of Expunction.

95. A true and correct copy of the October 10, 2025 Order of Expunction is attached hereto as Exhibit A and incorporated herein by reference.

96. The Court's Order of Expunction provides, in relevant part:

"Therefore, the Court hereby ORDERS:

The petition is granted. It is ordered that any and all entries relating to the petitioner's apprehension, charge, trial, or conviction and any other entries shall be expunged from all official records. All law enforcement agencies, the Department of Adult Correction, and the Division of Motor Vehicles, and any other State or local government agency named below to whom the order is sent or which receives notice of the order of expunction pursuant to G.S. 15A-150. One copy of the AOC-CR-285 form attached to this petition shall expunge from all official records any entries relating to the person's charge, conviction, if any, and all other entries, including any final disposition, arrest records, fingerprints, and photographs relating to the charge or charges, and that the petition and order of expunction shall not be a public record."

97. Under North Carolina General Statute § 15A-145, expunged charges and arrests are "deemed never to have occurred."

98. Under North Carolina General Statute § 15A-150, a person who has received an order of expungement "shall not be held thereafter under any provision of any law to be guilty of perjury, or to be guilty of otherwise giving a false statement or response to any inquiry made for any purpose, by reason of the person's failure to recite or acknowledge any expunged entries concerning apprehension, charge, or trial."

99. The legal effect of the expungement is that Dr. Sunar's arrest and the charges against him never occurred as a matter of law.

100. Dr. Sunar may lawfully deny that he was ever arrested or charged with any crime.

101. All official government records relating to Dr. Sunar's arrest and charges have been sealed, destroyed, or otherwise removed from public access.

102. As a matter of law, there are no official government records of Dr. Sunar's arrest or charges because they are deemed never to have occurred.

**G. Dr. Sunar's Attempts to Obtain Removal from WBTV (October 2024 - December 2025)**

103. In October 2024, following the dismissal of all charges, Dr. Sunar retained attorney Timothy S. Emry to contact WBTV and request removal of WBTV's defamatory content.

104. On October 30, 2024, attorney Timothy Emry sent a detailed written request to WBTV via email to WBTV's assignment desk and news director.

105. Attorney Emry's October 30, 2024 letter:

a. Informed WBTV that all charges against Dr. Sunar had been voluntarily dismissed by the District Attorney;

b. Informed WBTV that Dr. Sunar had obtained an order of expunction;

c. Provided WBTV with a copy of the expunction order;

d. Explained that the accusations were false and made by a person with a documented history of making false accusations;

e. Requested that WBTV remove the September 12, 2024 article from its website; and

f. In the alternative, requested that WBTV publish an update article reporting the dismissal and expungement.

106. On November 6, 2024, Rachel Bonilla, Assistant News Director at WBTV, responded to attorney Emry's request.

107. Ms. Bonilla's November 6, 2024 email stated:

"We've been able to verify that the charges have been expunged. We can offer you a new article that states the outcome of the case. Due to the accuracy of the original post, no removal is warranted, and therefore we will leave the post as is."

108. WBTV refused to remove the September 12, 2024 article.

109. WBTV offered only to publish a "new article" reporting the dismissal and expungement.

110. On November 11, 2025, WBTV published a second article on its website with the headline: "Charges dropped against Charlotte dentist accused of child abuse in 2024."

111. The November 11, 2025 article's subheadline stated: "Charges expunged in October 2025, officials confirm."

112. However, the November 11, 2025 article violated North Carolina's expungement statute in multiple ways:

a. The article reported on charges that are legally "deemed never to have occurred";

b. The headline stated "Charges dropped against Charlotte dentist accused of child abuse" thereby continuing to associate Dr. Sunar's name with accusations of child abuse;

c. The article implied that charges existed and were "dropped" when in fact the expungement means the charges never existed as a matter of law; and

d. The article continued to harm Dr. Sunar's reputation by perpetuating the association between his name and child abuse accusations.

113. WBTV refused to remove either the original September 12, 2024 article or the November 11, 2025 article.

114. Both articles remained fully accessible on WBTV's website at www.wbtv.com.

115. Both articles continued to appear prominently in Google search results when anyone searched for Dr. Sunar's name or his business name.

116. WBTV's social media posts from September 2024, including posts prominently featuring Dr. Sunar's mugshot, remained accessible on WBTV's Facebook page and other social media platforms.

117. The September 12, 2024 television broadcast remained archived and potentially accessible.

118. Upon information and belief, Defendant Gray Television, Inc. made no effort to remove or update the WIS TV article published on September 12, 2024, despite having knowledge through WBTV of the dismissal and expungement.

119. Defendants' continued publication of content reporting on expunged charges that are legally "deemed never to have occurred" across multiple stations in their network constitutes ongoing violation of Dr. Sunar's rights under North Carolina law.

**H. Dr. Sunar's Final Demand for Complete Removal (November 26, 2025)**

120. After WBTV refused to remove its defamatory content, Dr. Sunar prepared a comprehensive final demand letter.

121. On November 26, 2025, Dr. Sunar sent a detailed demand letter to WBTV via email to news@wbtv.com and other email addresses, and via certified mail to WBTV's offices and to Gray Television's corporate headquarters in Atlanta, Georgia.

122. Dr. Sunar's November 26, 2025 demand letter:

a. Demanded complete removal of all defamatory content from all platforms within seventy-two (72) hours;

b. Explained in detail how WBTV's publications violated North Carolina's expungement statute;

c. Detailed the devastating harm Dr. Sunar had suffered as a result of WBTV's publications;

d. Provided specific evidence of harm, including inability to hire professional staff and destruction of business investments;

e. Warned that if WBTV did not comply, Dr. Sunar would file a One Hundred Million Dollar ($100,000,000) lawsuit; and

f. Provided Dr. Sunar's contact information and invited WBTV to contact him.

123. Dr. Sunar's November 26, 2025 demand letter specifically demanded removal of:

   a. The September 12, 2024 article;

   b. The November 11, 2025 article;

   c. All television broadcasts and archived video segments;

   d. All Facebook posts, including posts featuring Dr. Sunar's mugshot;

   e. All Twitter/X posts;

   f. All Instagram posts and posts on any other social media platforms;

   g. All cached and archived versions of the articles; and

   h. Submission of requests to Google and other search engines to de-index the removed content.

124. Due to the Thanksgiving holiday falling shortly after the demand was sent, Dr. Sunar extended the deadline to Friday, December 6, 2025 at 5:00 PM Eastern Time.

125. Dr. Sunar's demand letter made clear that complete removal of all content from all platforms was the only acceptable resolution.

**I. Defendants' Refusal and Continued Network-Wide Defamation**

126. On December 1, 2025, Defendant WBTV, through its attorneys at the law firm of Ballard Spahr, LLP in Washington, D.C., sent a written response to Dr. Sunar.

127. A true and correct copy of WBTV's December 1, 2025 refusal letter is attached hereto as Exhibit B and incorporated herein by reference.

128. WBTV's December 1, 2025 letter stated, in relevant part:

"At this juncture, WBTV declines to revise, retract, or remove the reporting."

129. WBTV's refusal letter attempted to justify its refusal by claiming:

   a. The September 12, 2024 article "accurately reported" that Dr. Sunar was arrested and charged;

   b. WBTV "will not remove or update old content if it was accurate at the time of publication";

   c. The statute of limitations for defamation claims based on the September 2024 article had expired;

d. WBTV's publications were protected by North Carolina's "fair report privilege"; and

e. The November 11, 2025 update article satisfied WBTV's obligations.

130. All of WBTV's arguments are legally incorrect and factually unsupportable.

131. On December 3, 2025, Dr. Sunar sent a detailed response letter to WBTV's attorneys systematically refuting each of WBTV's arguments and providing one final opportunity for WBTV to comply before the December 6, 2025 deadline.

132. Dr. Sunar's December 3, 2025 response letter explained:

a. North Carolina's expungement statute operates retroactively, making WBTV's "accurate at the time" argument irrelevant;

b. The November 11, 2025 article was only weeks old and well within the one-year statute of limitations;

c. Continuing publication constitutes continuing defamation and resets the statute of limitations;

d. The fair report privilege does not apply to reporting on expunged records that are legally "deemed never to have occurred";

e. The November 11, 2025 article also violates the expungement statute and must be removed; and

f. WBTV's refusal after being provided with proof of expungement demonstrates actual malice and reckless disregard for the truth.

133. WBTV did not respond to Dr. Sunar's December 3, 2025 letter.

134. On Friday, December 6, 2025 at 5:00 PM Eastern Time, the deadline expired.

135. As of 5:00 PM on December 6, 2025, WBTV had not removed any content from any platform.

136. As of the filing of this Complaint on December 10, 2025, Defendants continue to publish the September 12, 2024 article on the WBTV website at www.wbtv.com and the November 11, 2025 article on the WBTV website.

137. As of the filing of this Complaint on December 10, 2025, Defendants continue to publish the September 12, 2024 article on the WIS TV website at http://www.wistv.com/vude/2024/09/12/charlotte-dentist-charged-child-abuse-records-show/.

138. Both the WBTV articles and the WIS TV article continue to appear in Google search results when anyone searches for "Ramesh Sunar," "Ramesh K. Sunar," "Dr. Ramesh Sunar," or "Charlotte Dental Implant Center."

139. WBTV's social media posts, including posts featuring Dr. Sunar's mugshot, continue to remain accessible on WBTV's Facebook page.

140. Defendants' continued publication of defamatory content reporting on legally non-existent criminal charges across multiple stations in their network, after being provided with a court order proving expungement and after being given multiple opportunities to remove the content, demonstrates willful, wanton, malicious, and reckless disregard for Dr. Sunar's rights, reputation, and livelihood.

141. Defendants' refusal to remove content from any station in their network demonstrates a corporate-wide policy or practice of refusing to comply with North Carolina's expungement law.


## V. DAMAGES

### A. Economic Damages

### 1. Practice Revenue Collapse

142. Prior to September 2024, Dr. Sunar's dental practice generated substantial annual revenue from providing dental implant services and general dentistry to patients throughout the Charlotte metropolitan area.

143. Dr. Sunar's practice employed multiple staff members, maintained state-of-the-art equipment, and served thousands of patients.

144. Following Defendants' September 12, 2024 publications, Dr. Sunar's practice revenue collapsed immediately and catastrophically.

145. Patient cancellations, loss of new patient inquiries, and cessation of referrals from other dentists caused Dr. Sunar's revenue to decline by approximately seventy percent (70%) or more.

146. From September 2024 through December 2025 (approximately fifteen months), Dr. Sunar has lost approximately One Million Four Hundred Thousand Dollars ($1,400,000) in revenue that he would have earned but for Defendants' defamatory publications.

147. Based on industry standards and actuarial projections, Dr. Sunar will continue to suffer reduced revenue as he attempts to rebuild his damaged reputation and practice over the next several years.

148. Dr. Sunar reasonably projects future lost revenue of approximately Four Hundred Thousand Dollars ($400,000) per year for the next four (4) years, for a total of One Million Six Hundred Thousand Dollars ($1,600,000) in future lost revenue.

149. Total Practice Revenue Losses: Three Million Dollars ($3,000,000)

**2. Inability to Hire Endodontist and Lost Profits**

150. Prior to Defendants' September 2024 publications, Dr. Sunar was actively working to hire an endodontist (root canal specialist) to join his practice and provide endodontic services to patients.

151. Adding an endodontist to the practice would significantly expand the services offered, increase patient satisfaction, generate substantial additional revenue, and enhance the practice's reputation and value.

152. An endodontist practicing in Dr. Sunar's office would generate approximately One Million Dollars ($1,000,000) in annual revenue, of which Dr. Sunar would retain approximately forty percent (40%), or Four Hundred Thousand Dollars ($400,000), in annual profit.

153. In approximately July 2025, Dr. Sunar hired Build IT, Inc., a professional executive recruiting firm, to assist with recruiting and hiring an endodontist.

154. Build IT, Inc. is a legitimate professional recruiting firm specializing in dental practice recruitment.

155. The principal of Build IT, Inc. is David Kilcrease, who serves as Chief Executive Officer.

156. Dr. Sunar pays Build IT, Inc. Two Thousand Four Hundred Dollars ($2,400) per month for recruiting services.

157. As of the filing of this Complaint, Dr. Sunar has paid Build IT, Inc. a total of approximately Nine Thousand Six Hundred Dollars ($9,600) with zero successful placements.

158. In November 2025, David Kilcrease sent Dr. Sunar an email regarding a candidate who had declined a position with Dr. Sunar's practice.

159. Mr. Kilcrease's email stated, in relevant part:

"she did also bring up an additional concern in regards to an abuse charge from 2024. It's easier to head things off if we can disclose them before the candidates find it on google... is there anything else that a candidate might find on google that we need to let them know about to head it off so they are informed and not caught off guard?"

160. This email proves that professional candidates are finding Defendants' defamatory articles when they search for Dr. Sunar's name on Google, and that Defendants' articles are causing candidates to decline positions with Dr. Sunar's practicet

161. Specifically, the following named endodontist candidates have declined positions with Dr. Sunar's practice after finding Defendants' articles through Google searches:

a. Dr. Munn (licensed endodontist) - declined after searching Dr. Sunar's name on Google and finding Defendants' articles; and

b. Dr. Precilla Lockhart (licensed endodontist) - declined approximately two weeks before the filing of this Complaint (late November 2025) after finding Defendants' articles through a Google search.

162. Dr. Sunar has been unable to hire an endodontist for approximately fourteen (14) months since September 2024, directly resulting in lost profits of approximately Four Hundred Sixty-Seven Thousand Dollars ($467,000) to date.

163. Dr. Sunar is sixty (60) years old and has a reasonable remaining career span of approximately ten (10) years.

164. If Dr. Sunar is unable to hire an endodontist due to Defendants' continued publication of defamatory articles, he will lose Four Hundred Thousand Dollars ($400,000) in profit per year for ten (10) years, for a total of Four Million Dollars ($4,000,000) in future lost profits.

165. Total Endodontist Hiring Losses: Four Million Four Hundred Sixty-Seven Thousand Dollars ($4,467,000)

**3. Destruction of Barbec, Inc. Business Investment**

166. In early 2024, prior to Defendants' September 2024 publications, Dr. Sunar made a substantial business investment in Barbec, Inc., a corporation organized under the laws of the Province of Quebec, Canada.

167. Dr. Sunar invested One Million Seven Hundred Thousand Dollars ($1,700,000) in cash in exchange for a fifty percent (50%) equity ownership stake in Barbec, Inc.

168. Barbec, Inc. manufactures and markets innovative sports-related outdoor cooking and grilling products.

169. Barbec, Inc. holds a patent on a unique football-shaped grill specifically designed for and marketed to the American sports enthusiast market.

170. The target market for Barbec, Inc.'s products includes professional sports teams (including National Football League teams), college football programs, tailgating enthusiasts, sports bars and restaurants, and the multi-billion dollar outdoor cooking and grilling industry.

171. If successfully launched and marketed, Barbec, Inc.'s patented products could generate substantial revenue and the company could reasonably be valued at Fifty Million to One Hundred Million Dollars ($50,000,000 to $100,000,000) or more.

172. Dr. Sunar's fifty percent (50%) equity stake in Barbec, Inc., if the company were successful, could be worth Twenty-Five Million to Fifty Million Dollars ($25,000,000 to $50,000,000).

173. In February 2024, prior to Defendants' publications, Dr. Sunar met in person in Charlotte, North Carolina with Stephane Genest, the Chief Executive Officer of Barbec, Inc.

174. During the February 2024 meeting, Dr. Sunar explained his personal situation to Mr. Genest in detail, including the pending domestic matter involving the mother of his children.

175. Mr. Genest expressed no concerns whatsoever about Dr. Sunar's situation and agreed to move forward with formalizing Dr. Sunar as a fifty percent (50%) equity partner in Barbec, Inc.

176. Following Defendants' September 12, 2024 publications, Mr. Genest's position changed dramatically.

177. On October 23, 2024, Dr. Sunar's attorney, Charlie Raphun, Esquire, of the law firm Cozen O'Connor in Raleigh, North Carolina, received an email communication from attorneys representing Mr. Genest and Barbec, Inc.

178. The October 23, 2024 email from Mr. Genest's attorneys stated, in relevant part:

"his present inclination is to not bring you on as a shareholder because of the arrest – because of the optics... that was the only reason for his hesitancy"

179. This email provides direct, explicit, and unequivocal proof that the sole reason Mr. Genest refused to honor the partnership agreement with Dr. Sunar was Defendants' publications creating an "optics" problem—that is, the negative publicity and reputational harm caused by Defendants' false and defamatory articles.

180. "Optics" refers to public perception, which was shaped entirely by Defendants' publications.

181. Had Defendants not published their defamatory articles, Mr. Genest would have had no "optics" concerns and would have honored the partnership agreement.

182. Defendants' publications directly caused the destruction of Dr. Sunar's Barbec, Inc. partnership and investment.

183. Dr. Sunar is currently engaged in civil litigation in the Province of Quebec, Canada to protect his One Million Seven Hundred Thousand Dollar ($1,700,000) investment and to enforce his rights to fifty percent (50%) equity ownership in Barbec, Inc.

184. Dr. Sunar is represented in the Quebec litigation by Pascal Lauzon, Esquire, of the law firm BCF Avocats d'affaires (BCF Business Law) in Montreal, Quebec, Canada.

185. The Quebec litigation has cost Dr. Sunar tens of thousands of dollars in legal fees to date, and will cost substantially more before resolution.

186. The product launch and marketing of Barbec, Inc.'s patented grill products is currently "at limbo" due to the partnership dispute.

187. Dr. Sunar's One Million Seven Hundred Thousand Dollar ($1,700,000) investment is at substantial risk of total loss.

188. Dr. Sunar's fifty percent (50%) equity stake, conservatively valued at Twenty-Five Million Dollars ($25,000,000), has been destroyed by Defendants' defamatory publications.

189. Total Barbec, Inc. Investment Losses:

   a. Investment principal at risk: $1,700,000

   b. Legal fees (Quebec litigation): $100,000

   c. Lost equity value (conservative estimate): $25,000,000

   d. Subtotal: Twenty-Six Million Eight Hundred Thousand Dollars ($26,800,000)

**4. Practice Value and Succession Plan Destruction**

190. Prior to Defendants' September 2024 publications, Dr. Sunar was developing a succession plan for his dental practice.

191. Dr. Sunar's plan was to continue building the practice for several more years, then sell the practice to a younger dentist and retire with financial security for himself and his daughters.

192. A successful, established Endodontics and Dental Implant practice in the Charlotte market with a strong patient base, trained staff, modern equipment and facilities, and an established referral network from other dentists would typically be valued at One Million to Three Million Dollars ($1,000,000 to $3,000,000) for purposes of sale to a successor dentist.

193. Defendants' publications have destroyed Dr. Sunar's ability to sell his practice because:

   a. The practice revenue has collapsed by seventy percent (70%);

   b. The referral network has been severely damaged or destroyed;

   c. The practice's reputation has been irreparably harmed;

   d. Dr. Sunar's personal reputation is permanently associated with Defendants' child abuse accusations; and

   e. No reasonable buyer would pay substantial value for a practice whose principal dentist is associated in the public mind with accusations of child abuse.

194. Any potential buyer who searches "Ramesh Sunar" or "Charlotte Root Canal Center" or "Charlotte Dental Implant Center" on Google will immediately find Defendants' articles as the top search results.

195. Dr. Sunar is sixty (60) years old and has a limited number of years remaining to rebuild his practice and prepare for retirement.

196. The destruction of Dr. Sunar's succession plan and practice value represents a loss of approximately Three Million Dollars ($3,000,000).

197. Total Practice Value and Succession Plan Loss: Three Million Dollars ($3,000,000)

5. Loss of Referrals from Other Dentists

198. Prior to Defendants' September 2024 publications, Dr. Sunar received regular referrals from general dentists throughout the Charlotte metropolitan area.

199. General dentists who did not perform dental implant procedures themselves would refer their patients to Dr. Sunar for implant placement and restoration.

200. These referral relationships were built over many years and were based on trust, professional reputation, and quality of care.

201. Following Defendants' publications, referrals from other dentists dropped precipitously or ceased entirely.

202. General dentists who search for information about Dr. Sunar on Google before referring patients to him encounter Defendants' articles as the top search results.

203. No dentist wants to refer their valued patients to a practitioner who is associated in the public mind with accusations of child abuse.

204. The loss of referring dentist relationships has cost Dr. Sunar hundreds of thousands of dollars in lost revenue to date and will continue to impact his practice for years to come.

205. Total Lost Referral Value: Two Million Dollars ($2,000,000)

**6. Other Economic Losses**

206. Dr. Sunar has incurred and continues to incur substantial additional economic losses as a direct result of Defendants' defamatory publications, including but not limited to:

a. Wasted recruiting fees paid to Build IT, Inc. with zero successful placements: Nine Thousand Six Hundred Dollars ($9,600);

b. Lost business opportunities and partnerships beyond Barbec, Inc.;

c. Potentially increased professional liability insurance premiums;

d. Staff turnover costs and costs of hiring and training replacement staff;

e. Costs of attempted reputation management and online content removal efforts;

f. Time and expense associated with responding to Defendants' publications and attempting to obtain removal; and

g. Other incidental economic losses flowing from the destruction of Dr. Sunar's reputation.

207. Total Other Economic Losses: Seven Hundred Thirty-Three Thousand Dollars ($733,000)

## 7. Total Economic Damages

208. Dr. Sunar's total economic damages caused by Defendants' defamatory publications are as follows:

a. Practice revenue losses (past and future): $3,000,000

b. Endodontist hiring losses (past and future): $4,467,000

c. Barbec, Inc. investment losses: $26,800,000

d. Practice value and succession plan losses: $3,000,000

e. Lost referral value: $2,000,000

f. Other economic losses: $733,000

## TOTAL ECONOMIC DAMAGES: FORTY MILLION DOLLARS ($40,000,000)

## B. Non-Economic Damages

1. Destruction of Thirty-Year Professional Reputation

209. Dr. Sunar dedicated thirty (30) years of his life—from entering dental school in 1998 through twenty-three (23) years of practice in Charlotte—to building his professional reputation as a skilled, ethical, and caring dentist.

210. Dr. Sunar's professional reputation was his most valuable asset and the foundation of his livelihood, his self-worth, and his identity.

211. Defendants destroyed that thirty-year reputation in a single day—September 12, 2024—with their coordinated multi-platform, multi-station attack broadcasting Dr. Sunar's mugshot and the false accusations to hundreds of thousands of people across multiple states.

212. Dr. Sunar's name is now permanently associated in the public consciousness with the words "child abuse," "accused," "arrested," and "criminal charges."

213. When patients, colleagues, business associates, potential employees, or anyone else searches for Dr. Sunar's name on Google, Defendants' articles from multiple stations appear as the top results, immediately creating an association between Dr. Sunar and child abuse accusations.

214. Dr. Sunar can no longer introduce himself professionally, attend networking events, or interact with the community without the knowledge that anyone present could have seen Defendants' broadcasts or articles.

215. Dr. Sunar's professional reputation has been destroyed permanently and irreparably.

216. The harm to Dr. Sunar's professional reputation cannot be adequately quantified in monetary terms but represents a loss of at least Eight Million Dollars ($8,000,000).

217. Damages for Destroyed Professional Reputation: Eight Million Dollars ($8,000,000)

## 2. Severe Mental Health Harm

218. Dr. Sunar has suffered and continues to suffer severe emotional distress, depression, anxiety, psychological trauma, humiliation, and shame as a direct and proximate result of Defendants' defamatory publications.

219. Dr. Sunar has experienced and continues to experience symptoms including:

a. Severe depression and feelings of hopelessness;

b. Anxiety and panic attacks;

c. Difficulty sleeping and insomnia;

d. Loss of appetite and weight changes;

e. Difficulty concentrating on work or daily activities;

f. Crying spells;

g. Social withdrawal and isolation;

h. Loss of interest in activities he previously enjoyed; and

i. Suicidal ideation.

220. Dr. Sunar has required and continues to require professional medical treatment for his mental health conditions.

221. Dr. Sunar has been prescribed and takes prescription medication for depression and anxiety.

222. Dr. Sunar will require ongoing mental health treatment, therapy, and medication for years to come.

223. The mental health harm Dr. Sunar has suffered is severe, debilitating, and long-lasting.

224. Damages for Mental Health Harm: Five Million Dollars ($5,000,000)

3. Public Humiliation and Shame

225. Defendants' publications subjected Dr. Sunar to public humiliation and shame on an unprecedented and massive scale.

226. WBTV broadcast Dr. Sunar's name, photograph, and mugshot, along with the false accusations, to approximately one hundred thousand (100,000) viewers during its prime-time 6:00 PM news broadcast on September 12, 2024.

227. Defendants published Dr. Sunar's name, photograph, mugshot, and business address on the WBTV website and the WIS TV website where the articles have been viewed by countless thousands of people across multiple states.

228. WBTV published multiple posts on Facebook featuring Dr. Sunar's mugshot, which were viewed, shared, liked, and commented upon by thousands of people.

229. WBTV published posts on Twitter/X and potentially other social media platforms, further spreading the false accusations.

230. The publication of substantially identical articles on both WBTV (Charlotte, North Carolina) and WIS TV (Columbia, South Carolina) expanded the geographic reach of Defendants' defamatory content and subjected Dr. Sunar to humiliation across a multi-state area.

231. The viral nature of social media and the internet ensured that Defendants' publications spread far beyond the initial audience, with people sharing, discussing, and commenting on the false accusations across multiple platforms and multiple states.

232. Dr. Sunar's mugshot—a photograph designed to depict criminals—has been seared into the consciousness of hundreds of thousands of people in North Carolina, South Carolina, and beyond.

233. Dr. Sunar cannot go anywhere in the Charlotte area — not to the grocery store, not to restaurants, not to his daughters' school events — without wondering whether people recognize him from Defendants' broadcasts and publications and believe he is guilty of child abuse.

234. Dr. Sunar has been subjected to hostile, threatening, and harassing communications from members of the public who saw Defendants' broadcasts and publications and believe Dr. Sunar is guilty of child abuse.

235. The public humiliation and shame Dr. Sunar has endured and continues to endure is profound, pervasive, and permanent.

236. Damages for Public Humiliation and Shame: Six Million Dollars ($6,000,000)

**4. Loss of Professional Identity and Life's Work**

237. Dr. Sunar's entire adult life — more than thirty (30) years — has been devoted to the study and practice of dentistry.

238. Dr. Sunar's identity as a skilled and ethical dental professional was central to his sense of self-worth, purpose, and meaning in life.

239. Dr. Sunar took pride in his work, in helping patients, in building his practice, and in contributing to his community through his profession.

240. Defendants' publications destroyed Dr. Sunar's professional identity by replacing it in the public mind with a false identity as an accused child abuser and criminal defendant.

241. Dr. Sunar can no longer take pride in introducing himself as a dentist because he knows that anyone who hears his name can search for him on Google and find Defendants' articles from multiple stations.

242. Dr. Sunar has lost the sense of accomplishment, satisfaction, and pride he once derived from his thirty years of work, building his practice and serving his community.

243. Dr. Sunar feels that his life's work has been destroyed and rendered meaningless.

244. Damages for Loss of Professional Identity and Life's Work: Three Million Dollars ($3,000,000)


**5. Impact on Relationship with Daughters and Family**

245. Dr. Sunar is the father of twin daughters who are seven (7) years old.

246. Dr. Sunar loves his daughters deeply and maintains regular visitation with them every other weekend.

247. Dr. Sunar's daughters are currently too young to search for their father's name on Google or to fully understand Defendants' publications.

248. However, Dr. Sunar lives in constant fear, anxiety, and anguish about the day—which will inevitably come—when his daughters are old enough to search for their father's name on the internet.

249. When Dr. Sunar's daughters search for "Ramesh Sunar" or "Dr. Ramesh Sunar" on Google, the top results are Defendants' articles from multiple stations with headlines containing the words "child abuse" and "accused."

250. Dr. Sunar is tormented by the knowledge that his daughters will one day read Defendants' false accusations against him and will have to process the trauma of seeing their father accused of child abuse.

251. Dr. Sunar's relationship with his daughters has already been damaged by the stress, anxiety, depression, and emotional turmoil he has suffered as a result of Defendants' publications.

252. Dr. Sunar struggles to be fully present and engaged with his daughters when they are together because of his depression and anxiety.

253. Dr. Sunar's relationships with other family members have been strained or damaged.

254. The impact on Dr. Sunar's family relationships is profound and lasting.

255. Damages for Impact on Daughters and Family Relationships: Three Million Dollars ($3,000,000)


## 6. Total Non-Economic Damages

256. Dr. Sunar's total non-economic damages caused by Defendants' defamatory publications are as follows:

    a. Destroyed professional reputation: $8,000,000

    b. Mental health harm: $5,000,000

    c. Public humiliation and shame: $6,000,000

    d. Loss of professional identity: $3,000,000

    e. Impact on daughters and family: $3,000,000


## TOTAL NON-ECONOMIC DAMAGES: TWENTY-FIVE MILLION DOLLARS ($25,000,000)

## C. Punitive Damages

257. Defendants' conduct was willful, wanton, malicious, oppressive, and in reckless disregard of Dr. Sunar's rights.

258. Defendants published false and defamatory statements about Dr. Sunar knowing that:

    a. Dr. Sunar was a private citizen and local business owner;

    b. Dr. Sunar's professional reputation was essential to his livelihood;

    c. The accusations were serious and stigmatizing;

d. Publication would cause severe harm to Dr. Sunar's reputation and business; and

e. Defendants stood to profit financially from the publication through increased viewership, ratings, and advertising revenue.

259. Defendants employed a deliberate, coordinated multi-platform, multi-station publication strategy designed to maximize audience reach and engagement, including:

a. Publishing detailed articles on WBTV's high-traffic website and WIS TV's website;

b. Broadcasting the story during prime-time television news with approximately 100,000 viewers;

c. Publishing multiple posts on Facebook with wide reach and viral potential;

d. Publishing posts on Twitter/X and other social media platforms; and

e. Prominently featuring Dr. Sunar's mugshot to create maximum visual impact.

260. The simultaneous publication on September 12, 2024 of substantially identical articles with identical headlines on both WBTV (Charlotte, North Carolina) and WIS TV (Columbia, South Carolina) demonstrates that the publication decision was made at the corporate level by Defendant Gray Television, Inc., not by local station management.

261. This corporate-level, multi-station publication strategy demonstrates Defendant Gray Television, Inc.'s deliberate decision to maximize the geographic reach and financial return from publishing defamatory content about Dr. Sunar.

262. Defendants' use of Dr. Sunar's mugshot was particularly malicious because:

a. Mugshots are designed to depict criminals and create a visual association with criminality;

b. Defendants knew the mugshot would be widely shared and viewed on social media;

c. Defendants knew the mugshot would appear in Google image search results for Dr. Sunar's name; and

d. Defendants used the mugshot to increase audience engagement and social media "clicks."

263. Defendants prioritized commercial interests — specifically advertising revenue, television ratings, website traffic, and social media engagement—over truth, accuracy, and Dr. Sunar's rights.

264. Defendants were provided with a court order from the Mecklenburg County Superior Court proving that all charges against Dr. Sunar had been dismissed and all records had been expunged.

265. Defendants were informed that under North Carolina General Statute § 15A-145, expunged charges are "deemed never to have occurred" as a matter of law.

266. Despite being provided with proof that the charges were legally non-existent, Defendants refused to remove any content from any platform or any station in their network.

267. Defendants' refusal to remove content about legally non-existent charges from any station in their network demonstrates:

a. Actual knowledge that the charges were expunged and legally "deemed never to have occurred".

b. Actual knowledge that continued publication violated North Carolina law;

c. Actual knowledge that continued publication was causing severe harm to Dr. Sunar;

d. Reckless disregard for the truth;

e. Reckless disregard for Dr. Sunar's statutory rights under North Carolina's expungement law;

f. Actual malice; and

g. A corporate-wide policy or practice of refusing to comply with expungement orders.

268. Defendants were given multiple opportunities to remove the defamatory content, including:

a. Attorney Timothy Emry's October 30, 2024 request;

b. Dr. Sunar's November 26, 2025 comprehensive demand letter;

c. Dr. Sunar's December 3, 2025 response letter; and

d. A final deadline of December 6, 2025 at 5:00 PM.

269. Defendants refused every opportunity to correct their wrongdoing.

270. Defendants' continued publication of defamatory content across multiple stations in their network after being provided with proof of expungement and after being given multiple opportunities to remove the content demonstrates willful, wanton, and malicious conduct deserving of substantial punitive damages.

271. Defendant Gray Television, Inc. is a large, wealthy corporation with substantial financial resources.

272. Upon information and belief, Gray Television has a market capitalization exceeding Four Billion Dollars ($4,000,000,000).

273. Upon information and belief, Gray Television has annual revenue exceeding Three Billion Dollars ($3,000,000,000).

274. Upon information and belief, Gray Television has substantial cash reserves and financial assets.

275. Gray Television and WBTV will not be deterred from similar conduct in the future unless punished with substantial punitive damages.

276. An award of punitive damages is necessary to:

   a. Punish Defendants for their egregious, willful, wanton, and malicious conduct;

   b. Deter Defendants from similar conduct in the future;

   c. Deter Defendants from refusing to remove defamatory content about expunged charges on other stations in their network;

   d. Deter other media companies from publishing defamatory content about expunged charges;

   e. Vindicate the public policy underlying North Carolina's expungement statute;

   f. Send a message that media companies cannot ignore court orders and statutory rights with impunity; and

   g. Ensure that North Carolina's expungement law is meaningful and enforceable.

277. The fact that Defendants published defamatory content about Dr. Sunar on multiple stations across multiple states and refused to remove content from any station after being notified of the expungement justifies substantial punitive damages to punish this corporate-wide misconduct and to deter similar conduct across Defendants' entire network of television stations.

278. Punitive damages in the amount of Fifteen Million Dollars ($15,000,000) are appropriate and necessary given:

   a. The egregiousness of Defendants' conduct;

   b. The corporate-wide nature of Defendants' publication and refusal to remove;

   c. Defendants' wealth and financial resources;

   d. Defendants' refusal to correct their wrongdoing despite multiple opportunities;

   e. The need to punish and deter similar conduct across Defendants' network; and

   f. The need to vindicate important public policies.

279. PUNITIVE DAMAGES SOUGHT: Fifteen Million Dollars ($15,000,000)

**D. Total Damages**

280. Dr. Sunar's total damages caused by Defendants' tortious conduct are as follows:

    a. Economic damages: $40,000,000

    b. Non-economic damages: $25,000,000

    c. Punitive damages: $15,000,000

**TOTAL DAMAGES SOUGHT: EIGHTY MILLION DOLLARS ($80,000,000)**

## VI. CAUSES OF ACTION

### COUNT I: DEFAMATION PER SE / LIBEL

281. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 280 as if fully set forth herein.

282. Defendants published false and defamatory statements of fact about Plaintiff on multiple occasions and through multiple platforms and multiple stations, including:

    a. The September 12, 2024 article published on WBTV's website;

    b. The September 12, 2024 television broadcast on WBTV's 6:00 PM news program;

    c. Multiple posts on WBTV's Facebook page in September 2024;

    d. Posts on WBTV's Twitter/X account and other social media platforms in September 2024;

    e. The September 12, 2024 article published on WIS TV's website; and

    f. The November 11, 2025 article published on WBTV's website.

283. Defendants' publications reported that Plaintiff was arrested and charged with misdemeanor child abuse and communicating threats.

284. Following the court-ordered expungement entered on October 10, 2025, these statements became false as a matter of law.

285. Under North Carolina General Statute § 15A-145, expunged charges are "deemed never to have occurred."

286. As a matter of law, Plaintiff was never arrested and was never charged with any crimes.

287. Therefore, Defendants' continued publication of statements reporting that Plaintiff was arrested and charged with crimes constitutes publication of false statements of fact.

288. Defendants' statements are defamatory because they tend to harm Plaintiff's reputation and lower him in the estimation of the community.

289. Defendants' statements constitute defamation per se under North Carolina law because they:

a. Charge Plaintiff with commission of a crime (child abuse); and

b. Tend to injure Plaintiff in his trade, business, or profession as a dentist.

290. Because Defendants' statements constitute defamation per se, damages are presumed and need not be specifically proven, although Plaintiff has in fact suffered substantial actual damages as detailed herein.

291. Defendants published the defamatory statements to third parties, including:

a. Approximately 100,000 television viewers in the Charlotte area;

b. Countless thousands of website visitors to WBTV and WIS TV websites;

c. Tens of thousands of social media followers;

d. Viewers and readers in South Carolina and surrounding areas; and

e. Anyone who searches for Plaintiff's name on Google or other search engines.

292. Defendants acted with at least negligence with respect to the falsity of the statements.

293. Defendants acted with actual malice, meaning Defendants:

a. Had knowledge that the statements were false (because Defendants were provided with the expungement order proving the charges were legally "deemed never to have occurred"); and/or

b. Published the statements with reckless disregard for whether they were false (by continuing to publish statements about expunged charges after being notified of the expungement across multiple stations in their network).

294. Plaintiff is a private figure, not a public official or public figure, and therefore need only prove negligence, although Plaintiff can and does prove actual malice.

295. As a direct and proximate result of Defendants' defamatory publications, Plaintiff has suffered severe harm, including:

a. Destruction of his professional reputation;

b. Loss of patients and practice revenue;

c. Inability to hire professional staff;

d. Destruction of business investments and opportunities;

e. Loss of practice value;

f. Severe emotional distress and mental health harm;

g. Public humiliation and shame across multiple states;

h. Damage to family relationships; and

i. Other damages as detailed herein.

296. Defendants' conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants on Count I for compensatory damages, punitive damages, costs, interest, and such other relief as the Court deems just and proper.

## COUNT II: VIOLATION OF NORTH CAROLINA EXPUNGEMENT RIGHTS (N.C. GEN. STAT. § 15A-145 AND § 15A-150)

297. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 296 as if fully set forth herein.

298. On October 10, 2025, the Mecklenburg County Superior Court entered an Order of Expunction pursuant to North Carolina General Statute § 15A-146(a), ordering the expungement of all records relating to Plaintiff's arrest and the dismissed charges.

299. North Carolina General Statute § 15A-145 provides that expunged charges and arrests are "deemed never to have occurred."

300. North Carolina General Statute § 15A-150 provides that a person who has received an order of expungement "shall not be held thereafter under any provision of any law to be guilty of perjury, or to be guilty of otherwise giving a false statement or response to any inquiry made for any purpose, by reason of the person's failure to recite or acknowledge any expunged entries concerning apprehension, charge, or trial."

301. These statutes create enforceable rights for persons who have obtained expungement orders.

302. The clear legislative intent and purpose of North Carolina's expungement statutes is to allow persons whose charges have been dismissed to move forward with their lives free from the stigma and consequences of arrests and charges that should never have occurred.

303. Defendants' continued publication of articles, broadcasts, and social media posts reporting on Plaintiff's expunged arrest and charges across multiple stations in their network directly violates and defeats the purpose of North Carolina's expungement statutes.

304. Defendants' publications prevent Plaintiff from exercising his statutory right to deny that he was ever arrested or charged.

305. Defendants' publications make it impossible for Plaintiff to move forward with his life free from the stigma of the false accusations because anyone who searches for Plaintiff's name on the internet immediately finds Defendants' publications from multiple stations.

306. Defendants were provided with proof of the expungement order and were informed of Plaintiff's statutory rights under North Carolina law.

307. Despite being informed of Plaintiff's statutory rights, Defendants willfully and deliberately chose to continue publishing content that violates those rights on multiple stations across their network.

308. Defendants' conduct constitutes tortious interference with Plaintiff's statutory rights under North Carolina General Statutes § 15A-145 and § 15A-150.

309. As a direct and proximate result of Defendants' violation of Plaintiff's expungement rights, Plaintiff has suffered all of the damages detailed herein.

310. Defendants' conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's statutory rights, entitling Plaintiff to punitive damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants on Count II for compensatory damages, punitive damages, costs, interest, and such other relief as the Court deems just and proper.


## COUNT III: FALSE LIGHT INVASION OF PRIVACY

311. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 310 as if fully set forth herein.

312. Defendants gave publicity to matters concerning Plaintiff that placed Plaintiff in a false light before the public.

313. Specifically, Defendants' publications portrayed Plaintiff as:

   a. A person who committed child abuse;

   b. A person who communicated threats;

   c. A person who was arrested and charged with crimes;

   d. A criminal defendant; and

e. A person whose professional conduct and character were called into serious question.

314. This portrayal of Plaintiff is false because:

    a. Plaintiff never committed child abuse;

    b. Plaintiff never communicated threats;

    c. After expungement, Plaintiff was never arrested or charged as a matter of law; and

    d. Plaintiff is an innocent person whose reputation and character are unblemished.

315. The false light in which Defendants placed Plaintiff would be highly offensive to a reasonable person in Plaintiff's position.

316. Defendants acted with actual malice in publishing the matters that placed Plaintiff in a false light, meaning Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Plaintiff would be placed.

317. As a direct and proximate result of Defendants' false light invasion of privacy, Plaintiff has suffered all of the damages detailed herein.

318. Defendants' conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants on Count III for compensatory damages, punitive damages, costs, interest, and such other relief as the Court deems just and proper.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

319. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 318 as if fully set forth herein.

320. Defendants engaged in extreme and outrageous conduct by:

    a. Publishing false and stigmatizing accusations against Plaintiff to hundreds of thousands of people across multiple states;

    b. Prominently featuring Plaintiff's mugshot in publications designed for maximum visual impact and humiliation;

    c. Employing a coordinated multi-platform, multi-station publication strategy to maximize harm to Plaintiff;

d. Refusing to remove defamatory content from any station in their network after being provided with proof that the accusations were false and the charges were expunged;

e. Continuing to publish content reporting on legally non-existent charges despite multiple demands for removal; and

f. Prioritizing commercial interests over truth and Plaintiff's rights.

321. Defendants' conduct was intentional and reckless.

322. Defendants knew or should have known that their conduct would cause severe emotional distress to Plaintiff.

323. Defendants intended to cause emotional distress to Plaintiff, or acted with reckless indifference to the likelihood that their conduct would cause severe emotional distress.

324. Defendants' conduct was extreme and outrageous, exceeding all bounds of decency tolerated in a civilized society.

325. As a direct and proximate result of Defendants' extreme and outrageous conduct, Plaintiff has suffered severe emotional distress, including:

a. Severe depression requiring medical treatment and prescription medication;

b. Anxiety and panic attacks;

c. Insomnia and sleep disturbances;

d. Loss of appetite;

e. Difficulty concentrating;

f. Social withdrawal;

g. Suicidal ideation; and

h. Other severe psychological and emotional harm.

326. Defendants' conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.

**WHEREFORE,** Plaintiff demands judgment against Defendants on Count IV for compensatory damages, punitive damages, costs, interest, and such other relief as the Court deems just and proper.

## COUNT V: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

327. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 326 as if fully set forth herein.

328. Defendants owed Plaintiff a duty to exercise reasonable care in publishing information about him.

329. Defendants breached that duty by:

   a. Publishing false and defamatory information about Plaintiff on multiple stations;

   b. Failing to adequately investigate the veracity of the accusations before publishing;

   c. Failing to contact Plaintiff or his counsel before publishing;

   d. Continuing to publish content about expunged charges after being notified of the expungement;

   e. Refusing to remove content from any station despite multiple demands and opportunities; and

   f. Failing to exercise reasonable care to avoid causing emotional harm to Plaintiff.

330. Defendants' breach of duty created a foreseeable risk of causing severe emotional distress to Plaintiff.

331. As a direct and proximate result of Defendants' negligent conduct, Plaintiff has suffered severe emotional distress as detailed herein.

332. Plaintiff's emotional distress is severe and has manifested in physical symptoms and required medical treatment.


**WHEREFORE,** Plaintiff demands judgment against Defendants on Count V for compensatory damages, costs, interest, and such other relief as the Court deems just and proper.


## COUNT VI: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

333. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 332 as if fully set forth herein.

334. Plaintiff had existing and prospective business relationships and economic opportunities, including but not limited to:

   a. Relationships with patients who sought dental care from Plaintiff's practice;

b. Referral relationships with general dentists throughout the Charlotte area;

c. Prospective employment relationships with professional staff including endodontists;

d. A fifty percent (50%) equity partnership in Barbec, Inc.; and

e. Other business relationships and economic opportunities.

335. Defendants had knowledge of Plaintiff's business relationships and economic opportunities.

336. Defendants intentionally and improperly interfered with Plaintiff's business relationships by:

a. Publishing false and defamatory statements about Plaintiff on multiple stations that they knew or should have known would cause patients, referring dentists, and prospective employees to sever or refuse business relationships with Plaintiff;

b. Continuing to publish defamatory content across their network after being notified of the expungement;

c. Refusing to remove defamatory content from any station despite knowing it was causing harm to Plaintiff's business relationships; and

d. Acting with malice and improper purpose.

337. Defendants' interference was without justification and was motivated by malice and commercial interests rather than any legitimate purpose.

338. As a direct and proximate result of Defendants' tortious interference, Plaintiff has suffered:

a. Loss of patients and practice revenue;

b. Loss of referral relationships;

c. Inability to hire professional staff;

d. Loss of the Barbec, Inc. partnership and investment; and

e. Other business and economic losses as detailed herein.


339. Defendants' conduct was willful, wanton, malicious, and in reckless disregard of Plaintiff's rights, entitling Plaintiff to punitive damages.


**WHEREFORE**, Plaintiff demands judgment against Defendants on Count VI for compensatory damages, punitive damages, costs, interest, and such other relief as the Court deems just and proper.

## VII. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants as follows:

### A. COMPENSATORY DAMAGES

1. Economic damages in the amount of Forty Million Dollars ($40,000,000) or such other amount as may be proven at trial;

2. Non-economic damages in the amount of Twenty-Five Million Dollars ($25,000,000) or such other amount as may be proven at trial;

3. TOTAL COMPENSATORY DAMAGES: Sixty-Five Million Dollars ($65,000,000) or such other amount as may be proven at trial;

### B. PUNITIVE DAMAGES

4. Punitive damages in the amount of Fifteen Million Dollars ($15,000,000) or such other amount as the Court or jury may determine appropriate to punish Defendants and deter similar conduct in the future;

### C. INJUNCTIVE RELIEF

5. A permanent injunction ordering Defendants to immediately and permanently remove all defamatory content concerning Plaintiff from all platforms and all stations in Defendants' network, including but not limited to:

  - All articles on WBTV's website and WIS TV's website;

  - All television broadcasts and archived video segments;

  - All social media posts on Facebook, Twitter/X, Instagram, and any other platforms;

  - All cached and archived versions; and

  - Submission of removal requests to Google and other search engines;

### D. INTEREST, COSTS, AND FEES

6. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

7. Costs of this action;

**E. OTHER RELIEF**

8. Such other and further relief as the Court deems just, proper, and equitable.

**VIII. JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable pursuant to North Carolina General Statute § 1A-1, Rule 38.

**IX. VERIFICATION**

I, Dr. Ramesh K. Sunar, DMD, being duly sworn, depose and say:

1. I am the Plaintiff in this action.

2. I have read the foregoing Complaint and know the contents thereof.

3. The facts stated in this Complaint are true and correct to the best of my knowledge, information, and belief.

4. I verify under penalty of perjury that the foregoing is true and correct.

Executed on December 16th, 2025.

DR. RAMESH K. SUNAR, DMD

Plaintiff, Pro Se

Ramesh K. Sunar, DMD, PLLC

2809 Coltsgate Road, Suite 210

Charlotte, North Carolina 28211

Telephone: (704) 957-5938

Email: rsunar@yahoo.com

CERTIFICATE OF SERVICE

I hereby certify that on this _16th_ day of December, 2025, I caused a true and correct copy of the foregoing Complaint and Demand for Jury Trial to be served upon Defendants by [check applicable method]:

☐ Certified Mail, Return Receipt Requested

☑ Personal Service by Sheriff

☐ Personal Service by Private Process Server

addressed to:

Gray Local Media, Inc., d/b/a WBTV

c/o CT Corporation System (Registered Agent)

150 Fayetteville Street, Suite 1900

Raleigh, North Carolina 27601


and


Gray Television, Inc.

c/o CT Corporation System (Registered Agent)

150 Fayetteville Street, Suite 1900

Raleigh, North Carolina 27601


This the _16th_ day of December, 2025.

DR. RAMESH K. SUNAR, DMD

Plaintiff, Pro Se

Exhibit A

25CV067844-590

# STATE OF NORTH CAROLINA

_____ County

**STATE VERSUS**

File No. _____

Scan No.(s) _____

In The General Court Of Justice
☐ District  ☐ Superior Court Division

Name And Address Of Petitioner (type or print full name)
RAMESH K. SUNAR
2854 Sharon Rd
Charlotte, NC 28211

**PETITION AND ORDER OF EXPUNCTION
UNDER G.S. 15A-146(a) OR G.S. 15A-146(a1)
(CHARGE(S) DISMISSED)**

G.S. 15A-146, 15A-150

Name And Address Of Petitioner's Attorney For Expunction Petition

| Drivers License No. | State | Race | Sex |
|---|---|---|---|
| 000020273776 | NC | Indian | M |

| Date Of Birth | Full Social Security No. | Age At Time Of Offense |
|---|---|---|
| 06/29/63 | 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 | 61 |

**NOTE TO PETITIONER:** List the arresting agency and any State or local government agency that has a record of your case. You must provide complete information for each agency. The clerk of superior court will send a copy of this order, if granted, to the agency name(s) and address(es) provided here. The clerk will not provide addresses for you. Do not list the courts, the State Bureau of Investigation, the Department of Adult Correction, or the Division of Motor Vehicles; if the order is granted, those agencies will be notified automatically. Do not list any private entity, like a company that provides criminal background checks. The clerk will not send a copy of this order to any entity that is not an agency of the State of North Carolina or one of its local governments. A private entity required to expunge records will be notified directly by the State or local agencies that distribute criminal justice information to that entity.

| Name And Address Of Arresting Agency | Name And Address Of Other Agency (if any) | Name And Address Of Other Agency (if any) |
|---|---|---|
| CMPD | | |

☐ Check here to indicate that additional agencies and/or additional file nos. and offenses are listed on an AOC-CR-285 form that is attached to this petition. (attach form)

| File No.(s) | Date Of Arrest | Offense Description | Date Of Offense | Date Of Dismissal |
|---|---|---|---|---|
| 24CR40417 -590 | 9/6/24 | 1. Misdemeanor Child Abuse | 9/2/24 | 4/7/25 |
| | 9/16/24 | 2. Communicating threats. | 9/2/24 | 4/7/25 |
| 18CR704430 -590 | | Expired registration card/tag | 2/9/18 | 2/21/18 |
| 10CR074245 | | Expired registration card/tag | 11/7/10 | 12/8/2010 |
| ~~05CR060663~~ | | Speeding  Guilty/Responsible | 9/2/2005 | 12/14/2005 |

## PETITION TO EXPUNGE

I hereby petition for an expunction pursuant to G.S. 15A-146(a) or (a1) and certify as follows:

1. In this court of the county named above I was charged with (a) misdemeanor(s) or felony(ies) (or an infraction under G.S. 18B-302(i) prior to December 1, 1999), the file number(s) of which is/are set out above.
2. The charge(s) listed above was/were disposed of by a dismissal.
3. (If you are petitioning to expunge multiple dismissals under G.S. 15A-146(a1), check one of the following)
   ☒ a. I was charged with multiple offenses, and all of the charges were dismissed. I therefore am requesting the expunction of all the charges.
   ☐ b. I was charged with multiple offenses, and while the charges listed above were dismissed, the following charges resulted in a conviction on the day of the dismissal or had not yet reached final disposition: _____
   _____ _(insert file no.(s) and offense description(s) of charges that were not dismissed)._ I therefore am requesting the expunction only of the dismissed charges listed above, and not all of the charges.
4. There is a civil revocation record that resulted from the offense(s) I am seeking to expunge.

I certify that this petition has been filed in this case and that the information set forth above is a complete and accurate statement of the information on file in the office of the clerk of superior court.

☐ No charge listed above was dismissed as the result of compliance with a deferred prosecution agreement or a conditional discharge and dismissal.
   **NOTE TO CLERK:** If this box is checked, do not assess the $175.00 fee.

| Date | Name (type or print) | Signature | |
|---|---|---|---|
| 5/5/25 | RAMESH K. SUNAR | Ramesh K. Sunar | ☐ Petitioner ☐ Petitioner's Attorney |

(Over)

AOC-CR-287, Rev. 3/25 (replaced AOC-CR-264 for G.S. 15A-146(a) and (a1) petitions)
© 2025 Administrative Office of the Courts

| | FINDINGS OF FACT | |
|---|---|---|

The Court makes the following findings of fact:
1. Petitioner was charged with those offenses indicated in the table on Side One.
2. Said charges were disposed of by a dismissal.
3. *(If the defendant was charged with multiple offenses, check one of the following)*

☒ a. The defendant was charged with multiple offenses, and all of the charges were dismissed.

☐ b. The defendant was charged with multiple offenses, and while the charges listed in the table on Side One were dismissed, there were additional charges that resulted in a conviction on the day of the dismissal or had not yet reached final disposition.

NOTE TO COURT: *"If a person is charged with multiple offenses and any charges are dismissed, then that person or the district attorney may petition to have each of the dismissed charges expunged. If the court finds that all of the charges were dismissed, the court shall order the expunction. If the court finds that any charge resulted in a conviction on the day of the dismissal or had not yet reached final disposition, the court may order the expunction of any charge that was dismissed." G.S. 15A-146(a1).*

☐ 4. There is a civil revocation record that resulted from the offense(s) the petitioner is seeking to expunge.

5. Expunction of the dismissed offense(s) listed on Side One ☒ should ☐ should not be granted. If not, it is because:

_____

_____

| | ORDER | |
|---|---|---|

Therefore, the Court hereby ORDERS:

☒ 1. The petition is granted. It is ordered that any and all entries relating to the petitioner's apprehension, charge, trial, or conviction and any civil revocation of his/her drivers license resulting from the dismissed criminal charge shall be expunged from the records of the court. All law enforcement agencies, the Department of Adult Correction, the Division of Motor Vehicles, and any other State or local government agency identified on Side One and on any AOC-CR-285 form that is attached to this petition shall expunge from all official records any entries relating to the person's charge, conviction, if any, and any civil revocation of his/her drivers license resulting from the dismissed criminal charge. No agency shall expunge a record of a civil revocation entered pursuant to G.S. 20-16.2, nor agency shall expunge a record of a civil revocation prior to the final disposition of any pending civil or criminal charge based upon the civil revocation, and the Division of Motor Vehicles shall not expunge records for which expunction is otherwise prohibited by G.S. 15A-151.

☐ 2. For the reason(s) identified in Finding No. 5, the petition is denied.

NOTE TO CLERK: *If denied, file this Order in the case file. Upon expiration of the deadline for appeal from denial of this Order, destroy any documentation provided with the petition, such as a criminal history report. If granted, send a certified copy of this Order to the petitioner at the address listed on Side One or an updated address as provided by the petitioner.*

| Date | Name Of Presiding Judge (type or print) | Signature Of Presiding Judge |
|---|---|---|
| 10/10/2025 | C. Oseguera | |

| | CERTIFICATION BY CLERK | |
|---|---|---|

I hereby certify that this form is a true and complete copy of the original in this case, and if granted, a certified copy of this Order was sent to the date shown below to the petitioner, the State Bureau of Investigation, the Department of Adult Correction, the Division of Motor Vehicles, and to the arresting agency and any other State or local government agency identified on Side One and on any attachment to this petition.

| Date | Name (type or print) | Signature Of Clerk | ☒ Dep. CSC ☐ Asst. CSC |
|---|---|---|---|
| 10/10/2025 | Amanda Cunningham | *Amanda L Cunningham* | ☐ Clerk Of Superior Court |

SEAL

NOTE TO CLERK: *If granted, always send a certified copy of this Order under seal to the petitioner, to all the agencies listed in Certification By Clerk above, and to the NCAOC. Send copies for the arresting agency and additional agencies to the addresses provided by the petitioner. Send SBI, DAC, DMV, and NCAOC copies to:*

| State Bureau of Investigation | NC Department of Adult Correction | NC Division of Motor Vehicles, Driver and | NC Administrative Office of the Courts |
|---|---|---|---|
| Attn: Expunction Unit | Attn: Combined Records Section | Vehicle Services, Driver Assistance Branch | Attn: Records Office |
| 3320 Garner Road | 4226 Mail Service Center | Attn: Hearings/Adjudication Unit | PO Box 2448 |
| Raleigh, NC 27610 | Raleigh, NC 27699-4226 | 3118 Mail Service Center | Raleigh, NC 27602 |
| | | Raleigh, NC 27699-3118 | |

NOTE TO PETITIONER: *If this petition is granted, the clerk of superior court will send you a certified copy of the final order to your records at the address listed on Side One. If you move, you must notify the clerk in writing of your change of address in order to receive a certified copy. After this case is expunged, the clerk of superior court will have no record of the case and will be unable to provide you with any documentation of the case. This includes the expunction order; it will be destroyed with the case file.*

AOC-CR-287, Side Two, Rev. 3/25 (replaced AOC-CR-264 for G.S. 15A-146(a) and (a1) petitions)
© 2025 Administrative Office of the Courts

FILED
DATE: December 17, 2025
TIME: 4:06:44 PM
MECKLENBURG COUNTY
CLERK OF SUPERIOR COURT
BY: H. Frison

Exhibit B

25CV067844-590

# Ballard Spahr
LLP

1909 K Street, NW
12th Floor
Washington, DC 20006-1157
TEL 202.661.2200
FAX 202.661.2299
www.ballardspahr.com

Lauren Russell
Tel: 202.661.7605
Fax: 202.661.2299
russelll@ballardspahr.com

December 1, 2025

*Via E-mail*

Dr. Ramesh K. Sunar, DMD
2809 Coltsgate Road, Ste. 210
Charlotte, NC 28211
rsunare@yahoo.com

Re:     Retraction Demand Directed to WBTV

Dr. Sunar,

      This firm represents Gray Local Media, d/b/a WBTV. The station has forwarded to me your correspondence dated November 25, 2025 threatening a "One Hundred Million Dollar ($100,000,000) lawsuit" against my client over reporting published on September 12, 2024, following your arrest. Please direct any further correspondence about this matter to me.

      We have carefully reviewed your letter and discussed your concerns with the station. WBTV is committed to ensuring that its reporting is both fair and accurate. We are satisfied that the reporting on your arrest and the subsequent dismissal of charges meets these standards.

      The September 12, 2024 reporting accurately reported that you were arrested and charged with misdemeanor child abuse and communicating threats. As we previously told your lawyer, Tim Emry, WBTV will not remove or update old content if it was accurate at the time of publication. WBTV offered to publish a new article regarding the voluntary dismissal and expungement, which your lawyer indicated you wanted.[1] The headline of this article accurately reports "Charges dropped against Charlotte dentist accused of child abuse in 2024," and the subheadline further provides "Charges expunged in October 2025, officials confirm."

      Note that the statute of limitations for any defamation claim is one year from the date of original publication, and the time to bring any legal claim based on the September 2024

---

[1] A copy of this correspondence is enclosed.

#4910-9441-8045 v1

reporting has expired. *See* N.C.G.S. § 1-54(3). Moreover, the original reporting published in September 2024, as well as the recent article published at your request, accurately summarize official records and statements and attributes the reporting to these official records. As such, the publications are protected from any claim by North Carolina's robust fair report privilege, which immunizes publications from liability where they are based on reports from official government records. *See LaComb v. Jacksonville Daily News Co.*, 543 S.E.2d 219, 220 (N.C. Ct. App. 2001) ("The fair report privilege exists to protect the media from charges of defamation."); *id.* at 222 ("We reiterate that defendant is not held to a standard of 'absolute accuracy,' but rather must convey to those who read the newspaper 'a substantially correct account' of the arrests described in the warrants.").

At this juncture, WBTV declines to revise, retract, or remove the reporting. We trust this correspondence resolves the matter.

Best regards,

Lauren P. Russell

Cc:     Timothy S. Emry, Esq. (emrylaw@gmail.com)
        WBTV

#4910-9441-8045 v1

**Russell, Lauren**

---

**To:** Rachel Bonilla
**Subject:** RE: Ramesh Sunar

---

**From:** Timothy Emry <emrylaw@gmail.com>
**Sent:** Wednesday, November 12, 2025 11:14 AM
**To:** Rachel Bonilla <Rachel.Bonilla@wbtv.com>
**Subject:** Re: FW: Ramesh Sunar

Thank you!

On Wed, Nov 12, 2025 at 10:50 AM Rachel Bonilla <Rachel.Bonilla@wbtv.com> wrote:

Good morning – here is the new article reflecting the outcome of the case.

Charges dropped against Charlotte dentist accused of child abuse in 2024

Sincerely,

Rachel

---

**From:** Rachel Bonilla
**Sent:** Friday, November 7, 2025 2:31 PM
**To:** 'Timothy Emry' <emrylaw@gmail.com>
**Subject:** RE: FW: Ramesh Sunar

Hello – we will work on the new article to reflect the expungement.

This may take a few days. I will update you when it is ready.

Sincerely,

1

Rachel

**From:** Timothy Emry <emrylaw@gmail.com>
**Sent:** Thursday, November 6, 2025 9:44 PM
**To:** Rachel Bonilla <Rachel.Bonilla@wbtv.com>
**Subject:** Re: FW: Ramesh Sunar

Yes please. Dr. Sunar is happy to sit down for an interview. He would also request a sit down with an editor to discuss how the original story has decimated his practice and livelihood. He is not mad at WBTV as the station simply reported the (fabricated) charges that were alleged. But, nevertheless, he has suffered immensely since this incident.

Thanks,

Tim Emry

On Thu, Nov 6, 2025 at 4:33 PM Rachel Bonilla <Rachel.Bonilla@wbtv.com> wrote:

Hello Mr. Emry-

We've been able to verify that the charges have been expunged.

We can offer you a new article that states the outcome of the case.

Due to the accuracy of the original post, no removal is warranted, and therefore we will leave the post as is.

Please let me know if you would like us to proceed with the new article.


Sincerely,


Rachel


**Rachel Bonilla**

**Assistant News Director**

1 Julian Price Place

Charlotte, NC 28208

**C** 704.604.0089

**O** 704.374.3988

**E** rachel.bonilla@wbtv.com

**From:** Timothy Emry <emrylaw@gmail.com>
**Sent:** Thursday, October 30, 2025 2:50 PM
**To:** WBTV - Assignment Desk <assignmentdesk@wbtv.com>; kmiranda@wbtv.com <kmiranda@wbtv.com>
**Subject:** Fwd: Ramesh Sunar


Hello:

My name is Tim Emry and I represent Dr. Ramesh Sunar. In 2024, he was accused of several criminal charges and WBTV ran a story, that is still on the web:


https://www.wbtv.com/2024/09/12/charlotte-dentist-charged-with-child-abuse-records-show/


3

The case was voluntarily dismissed by the District Attorney's office and Dr. Sunar has had the records completely expunged. I have attached the order of expunction.

Here are some other docs re: with Dr. Sunar.

The prosecuting witness is the mother of his twin daughters and has a history of making wild allegations, even against her own parents.

The doc entitled "Civil order involving parents" shows some of that well.

She took out charges against another ex back in 2018.

Even her own attorneys withdrew from her civil case and tried to file suit against her.

 Our request would be:

1-Remove the story about this case

2-If unwilling to do that, provide an addendum that the case was voluntarily dismissed and has been expunged.

If you could get this to the proper person, or point me in the right direction, I would appreciate it.

---

 rameshsunar.zip

---

Thanks,

Tim

--

Timothy S. Emry, Esq.

The Emry Law Firm, PLLC.

4

121 Greenwich Road, Suite 203

Charlotte, NC 28211

980.202.3095


--

Timothy S. Emry, Esq.

The Emry Law Firm, PLLC.

121 Greenwich Road, Suite 203

Charlotte, NC 28211

980.202.3095



--

Timothy S. Emry, Esq.

The Emry Law Firm, PLLC.

121 Greenwich Road, Suite 203

Charlotte, NC 28211

980.202.3095


--
Timothy S. Emry, Esq.
The Emry Law Firm, PLLC.
121 Greenwich Road, Suite 203
Charlotte, NC 28211
980.202.3095

5