FILED
CHARLOTTE, NC

MAR 1 0 2026

US DISTRICT COURT
WESTERN DISTRICT OF NC

## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF NORTH CAROLINA

## CHARLOTTE DIVISION

Case No. 3:26-cv-00129-KDB-DCK

DR. RAMESH K. SUNAR,

Plaintiff,

v.

GRAY MEDIA, INC. (formerly Gray Television, Inc.) and

GRAY LOCAL MEDIA, INC., d/b/a WBTV,

Defendants.

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff Dr. Ramesh K. Sunar, proceeding pro se, files this Amended Complaint against Defendants Gray Media, Inc. (formerly Gray Television, Inc.) and Gray Local Media, Inc. d/b/a WBTV (collectively 'Defendants' or 'WBTV'), and states as follows:

## NATURE OF THE ACTION

This is a defamation, tortious interference, and intentional infliction of emotional distress action arising from Defendants' deliberate and knowing choice to continue broadcasting

legally nullified criminal charges against a Charlotte dentist after receiving written confirmation that a court had declared those charges never to have occurred.

This case is not about whether WBTV had the right to report Dr. Sunar's arrest in September 2024. This case is about what happened next — and what Defendants deliberately chose to do when given every opportunity to correct the record.

Defendants received three separate formal demands to remove the defamatory content — in October 2024, April 2025, and November 2025. They refused every time. A competing Charlotte television broadcaster — WJZY-TV/WMYT-TV, doing business as Queen City News — received the identical request with the identical expungement documentation and removed the story within five days. Queen City News said two words: 'This has been removed.' WBTV said: 'No removal is warranted.' That choice — made three times, with full knowledge of the expungement, in defiance of the standard set by a direct competitor — is the heart of this lawsuit.

On November 6, 2025, WBTV's own Assistant News Director, Rachel Bonilla, wrote in a verified email: 'We've been able to verify that the charges have been expunged.' She then confirmed WBTV would leave the original article online. That single sentence — written by WBTV's own editorial leadership — establishes actual malice with documentary precision.

The consequences of Defendants' deliberate choices have been severe and documented. A $1.69 million investment opportunity was denied in writing because of the WBTV

reporting. Two named professional candidates declined employment specifically citing the WBTV articles found on Google. Two patients nearly cancelled a combined $102,000 in treatment plans after discovering the articles online. The WBTV articles were weaponized against Dr. Sunar in a business litigation proceeding — after the expungement — by an adversary who used them to weaken Dr. Sunar's negotiating position. And Dr. Sunar has suffered severe psychological harm, including suicidal ideations, requiring ongoing psychiatric care and prescription medication.

These are not speculative harms. They are documented facts supported by written evidence, signed affidavits, and medical records.

Plaintiff seeks compensatory damages, punitive damages, injunctive relief requiring removal and de-indexing of the defamatory content, and such other relief as this Court deems just and proper.

## PARTIES

1. Plaintiff Dr. Ramesh K. Sunar, DMD, is a citizen and resident of Mecklenburg County, North Carolina. He has practiced dentistry in Charlotte, North Carolina since 2002 — a period of 24 years. He is the founder and lead clinician of Charlotte Dental Implant Center and Charlotte Root Canal Center, both located at 2809 Coltsgate Road, Suite 210, Charlotte, NC 28211, specializing in dental implants, endodontics, and root canal therapy.

2.   Defendant Gray Media, Inc., formerly known as Gray Television, Inc. prior to January 1, 2025, is a corporation organized under the laws of the State of Georgia, with its principal place of business in Atlanta, Georgia. As Defendants' own counsel acknowledged in ECF 8 footnote 1, Gray Television, Inc. changed its name to Gray Media, Inc. on January 1, 2025. Gray Media, Inc. is one of the largest television broadcasting companies in the United States, operating more than 100 television stations reaching approximately 36 percent of United States television households, generating billions of dollars in annual revenue.

3.   Defendant Gray Local Media, Inc. is a subsidiary of Gray Media, Inc., organized under the laws of the State of Georgia, doing business as WBTV in Charlotte, North Carolina. WBTV operates a television broadcasting station in Charlotte and maintains an active commercial internet presence at www.wbtv.com, where its news content is published, commercially monetized through advertising, optimized for search engine indexing, and continuously accessible to the public.

4.   At all times relevant to this action, Defendants acted jointly and in concert in the publication, maintenance, commercial monetization, and active online distribution of the defamatory content described herein.

## JURISDICTION AND VENUE

5.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

6. Plaintiff is a citizen of North Carolina. Defendants are citizens of Georgia. Complete diversity exists between the parties.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the broadcast and online publication of the defamatory content directed at Charlotte-area audiences, the harm to Plaintiff's professional reputation and business relationships in Charlotte, the ongoing internet publication of the defamatory content discoverable by Charlotte-area patients and professionals, and the deliberate editorial decisions made regarding Charlotte-area content.

## FACTUAL ALLEGATIONS

### I. Dr. Sunar's Professional Background and Community Standing

8. Dr. Ramesh K. Sunar has practiced dentistry in Charlotte, North Carolina continuously since 2002. He earned his Doctor of Dental Medicine degree and completed advanced training in dental implantology and endodontics. He is the founder and lead clinician of two separate specialized dental practices — Charlotte Dental Implant Center and Charlotte Root Canal Center — both of which have served thousands of patients in the greater Charlotte metropolitan area over more than two decades.

9. Over 24 years, Dr. Sunar built a professional reputation in the Charlotte community grounded in clinical excellence, patient care, professional integrity, and community service. He is known and respected among patients, colleagues,

referral sources, and professional partners throughout the Charlotte area. He has maintained an impeccable professional disciplinary record throughout his career.

10. Dr. Sunar's professional reputation is the foundation of his livelihood and the livelihoods of his employees. As a healthcare provider in private practice, patient trust and professional reputation directly determine his ability to attract and retain patients, recruit qualified associates, develop business partnerships, and maintain the practice value he has built over 24 years.

11. Dr. Sunar's practices support multiple full-time employees. The destruction of his professional reputation caused by Defendants' conduct has endangered not only Dr. Sunar's livelihood but the livelihoods of every member of his staff.

## II. The September 2024 Arrest and Charges

12. On September 10-11, 2024, Dr. Sunar was arrested and charged with misdemeanor child abuse and communicating threats in Mecklenburg County, North Carolina. These charges arose from a personal family dispute, were based on accusations Dr. Sunar denied, and were ultimately determined to be entirely without merit.

13. Dr. Sunar was released from custody on an unsecured bond of $7,500 — meaning no money was required to be posted and Dr. Sunar was released on his personal recognizance. The presiding magistrate specifically informed Dr. Sunar that the unsecured bond was granted because Dr. Sunar had no prior history of violence of any kind. This contemporaneous judicial determination directly contradicts the image of a violent child abuser that WBTV's reporting permanently attached to

Dr. Sunar's name. He was never convicted of any offense. He was never found guilty of any wrongdoing by any court, tribunal, or regulatory body.

14. The charges were entirely unrelated to Dr. Sunar's professional practice of dentistry or his conduct toward patients. At no time was any allegation made that Dr. Sunar engaged in any professional misconduct or harmed any patient.

### III. The First Report — September 12, 2024

15. On September 12, 2024, WBTV published an article on its website, www.wbtv.com, titled 'Charlotte dentist charged with child abuse, records show' (the 'First Report'). The First Report was published at approximately 9:44 AM EDT and remained live on WBTV's website as of the date of this Amended Complaint.

16. The First Report prominently featured Dr. Sunar's mugshot photograph released by law enforcement. The mugshot was displayed at the top of the article and constituted the primary visual element of the publication — branding Dr. Sunar as a criminal suspect in the minds of every reader.

17. The First Report stated in relevant part that Dr. Sunar had been 'charged with misdemeanor child abuse and communicating threats'; that an arrest warrant said Dr. Sunar 'inflicted physical injury on a child younger than 16 years old'; that the injury 'allegedly caused bruising on the child's torso and neck, and was not caused by accidental means'; and that Dr. Sunar had made threatening statements. The First Report specifically identified Dr. Sunar as 'the lead doctor on Charlotte

Dental Implant Center's website,' directly linking the criminal accusations to his professional identity and practice.

18.    Simultaneously with the online publication, WBTV aired a broadcast report containing similar content, including Dr. Sunar's mugshot and video footage of handcuffs — a visceral symbol of criminal guilt that appears nowhere in the official charging documents — reaching the Charlotte metropolitan television audience. The broadcast was designed to maximize the sensational impact of the reporting: the mugshot branded Dr. Sunar as a criminal suspect, while the handcuff imagery conveyed guilt to viewers before a single word was spoken. This broadcast was embedded in the online article and was also published on WBTV's sister station WIS-TV's website, exponentially expanding the geographic reach of the defamatory content.

19.    On the same date, WBTV published Dr. Sunar's mugshot and a link to the First Report on its official Facebook page at www.facebook.com/WBTVNews3 (the 'Social Media Posts'). The Social Media Posts generated substantial public commentary visible to all of WBTV's followers — including at least one commenter publicly calling for Dr. Sunar's permanent imprisonment based solely on charges a court later declared never to have occurred, and multiple prominent Charlotte community members who personally knew Dr. Sunar coming to his public defense on WBTV's own platform, vouching for his character, and rejecting WBTV's narrative as unjust. WBTV did not remove the inflammatory comments. WBTV did not moderate or contextualize any of this commentary. WBTV left the entire volatile comment section standing permanently on its

official platform — a comment section it created and commercially monetized — based on charges a court later declared never to have occurred. Defendants themselves attached screenshots of these Social Media Posts and their associated public commentary as Exhibit 2 to their Motion to Dismiss, ECF 8-3, thereby introducing this evidence into the federal court record. Plaintiff notes that Defendants' decision to attach this commentary as a litigation exhibit — rather than the reporting itself — suggests a deliberate litigation strategy of using the public's visceral reaction to the child abuse accusation to argue the reporting was newsworthy and justified, notwithstanding the Expungement Order declaring those charges never to have occurred. As set forth in Section XV.E below, this strategy fails as a matter of law and the exhibit in fact constitutes powerful evidence of Plaintiff's damages. The Social Media Posts and their associated commentary remain publicly accessible as of the date of this Amended Complaint. True and correct copies of these Social Media Posts and their associated public commentary were filed by Defendants themselves as Exhibit 2 to their Motion to Dismiss, ECF 8-3, and are incorporated herein by reference.

20. As of the date of this Amended Complaint, the First Report remains live and publicly accessible at its original URL on www.wbtv.com. It is indexed by Google and appears prominently in search results for Dr. Sunar's name. The First Report has not been corrected, annotated, updated, or modified in any way to reflect the subsequent dismissal of charges, the entry of the Expungement Order, or the legal declaration that the underlying events never occurred.

## IV. The First Demand — October 2024

21. In October 2024, attorney Tim Emry, acting on behalf of Dr. Sunar, formally contacted WBTV and demanded removal of the First Report and Social Media Posts. Mr. Emry provided documentation of the circumstances and formally requested that WBTV take down the content.

22. WBTV refused this first demand. Defendants made no correction, annotation, or modification to the First Report in response to this demand.

23. This first refusal was made before the charges had been dismissed and before the expungement had been entered. It represents the beginning of a documented pattern of deliberate refusal that continued through the dismissal, through the expungement, and to the date of this filing.

## V. The Dismissal of Charges — April 7, 2025

24. On April 7, 2025, the Mecklenburg County District Attorney voluntarily dismissed all charges against Dr. Sunar. The dismissal reflected the prosecution's determination that the charges lacked sufficient merit to proceed to trial.

25. Following the dismissal of all charges on April 7, 2025, Dr. Sunar was legally innocent of all accusations. No charges remained pending. No conviction had ever been entered. The legal proceedings against Dr. Sunar had concluded entirely in his favor.

26. Notwithstanding the dismissal of all charges on April 7, 2025, WBTV continued to publish the First Report online without correction, annotation, or modification.

27. The critical distinction that defines this case: the arrest was a temporary event that ended. WBTV's publication made the destruction permanent. The District Attorney's dismissal did not remove the First Report. The Expungement Order did not remove the First Report. Three formal demands did not remove the First Report. As of the date of this filing, the First Report remains online, actively harming Dr. Sunar every day — more than nearly eighteen months after its original publication.

## VI. The Second Demand — April 2025

28. In April 2025, Dr. Sunar personally contacted WBTV following the dismissal of all charges and demanded removal of the First Report and Social Media Posts.

29. WBTV refused this second demand. Defendants again made no correction, annotation, or modification to the First Report.

30. This second refusal — made after the complete dismissal of all charges — establishes that Defendants' refusal was not based on any uncertainty about the legal proceedings. The prosecution had closed the case entirely. WBTV knew this and chose continued publication anyway.

## VII. The Expungement Order — October 10, 2025

31. On October 10, 2025, the Mecklenburg County Superior Court entered an Order of Expunction pursuant to N.C.G.S. § 15A-146 (the 'Expungement Order'). A true and correct copy of the Expungement Order is attached hereto as Exhibit A.

32. Under North Carolina law, an expungement order pursuant to N.C.G.S. § 15A-146 legally declares that the expunged charges are 'deemed never to have occurred.' The statute requires that all official records relating to the arrest and charges be destroyed or sealed. The legal effect of the Expungement Order is that, as a matter of North Carolina law, Dr. Sunar was never arrested, never charged, and the events of September 2024 are deemed by the Superior Court of Mecklenburg County never to have occurred.

33. Following entry of the Expungement Order, any statement that Dr. Sunar 'was arrested' or 'was charged with child abuse' became false as a matter of law — not merely misleading or incomplete, but legally false under the judicial declaration contained in the Expungement Order. A news organization that publishes about events that a court has declared never to have occurred is not publishing the truth. It is publishing a legal fiction that the judicial system has formally repudiated.

34. Dr. Sunar is legally entitled under North Carolina law to state under oath that he has never been arrested or charged with any criminal offense. WBTV's continued online publication of the First Report directly contradicts this legal reality and makes it impossible for Dr. Sunar to exercise his statutory rights without the specter of WBTV's articles undermining his truthful representations.


## VIII. The Bonilla Email — Actual Malice Established in Writing

35. In October 2025, following entry of the Expungement Order, Dr. Sunar's attorney formally contacted WBTV, provided proof of the Expungement Order, and

requested removal of the First Report or publication of an updated article reflecting the dismissal and expungement.

36. On November 6, 2025, Rachel Bonilla, WBTV's Assistant News Director, responded in writing as follows: 'We've been able to verify that the charges have been expunged. We can offer you a new article that states the outcome of the case. Due to the accuracy of the original post, no removal is warranted, and therefore we will leave the post as is.'

37. This email is the most consequential document in this case. In a single written statement, WBTV's own editorial leadership: (a) confirmed it had verified the expungement; (b) confirmed it understood the legal effect of the expungement; and (c) confirmed its deliberate, affirmative, institutional decision to continue publishing charges it knew a court had declared never to have occurred.

38. Ms. Bonilla's justification — 'due to the accuracy of the original post' — is legally untenable and itself demonstrates actual malice. A statement that was accurate when originally published becomes legally false when a court judicially declares the underlying events never to have occurred. The fair report privilege protects accurate contemporaneous reporting on official proceedings — it does not authorize a broadcaster to continue publishing charges that the judicial system has declared never to have happened, with full knowledge of that judicial declaration. Relying on original accuracy as justification for continued post-expungement publication reflects knowing disregard for the legal transformation wrought by the Expungement Order.

39. The Bonilla email constitutes written proof of actual malice as defined in New York Times Co. v. Sullivan, 376 U.S. 254 (1964) — knowledge of falsity or reckless disregard for the truth — established not by inference or circumstantial evidence but by Defendants' own written words.

40. A true and correct copy of the Bonilla email and related correspondence is attached hereto as Exhibit B.


**IX. The Second Report — November 11, 2025**

41. On November 11, 2025, WBTV published a second article titled 'Charges dropped against Charlotte dentist accused of child abuse in 2024,' with the subheading 'Charges expunged in October 2025, officials confirm' (the 'Second Report').

42. The Second Report's headline permanently and irrevocably associates Dr. Sunar's name with child abuse accusations in every Google search result, social media share, and online reference. The headline — 'Charges dropped against Charlotte dentist accused of child abuse in 2024' — is the primary text element encountered by the vast majority of readers who discover the article through search engines. A reasonable person encountering this headline in a Google search does not read exoneration. They read: Charlotte dentist. Child abuse. 2024. That association is permanent and irremovable regardless of what the article body states. Under applicable law, a headline can be independently defamatory even where article body text is facially exculpatory, because the overwhelming majority of internet users who encounter an article through search engine results read the headline and not the full article. See Kaelin v. Globe Communications Corp., 162 F.3d 1036

(9th Cir. 1998). The defamatory sting of this headline — permanently branding Dr. Sunar as a man 'accused of child abuse' — is not cured by body text that a fraction of readers will ever read.

43. The Second Report republishes and recirculates the core factual allegations of the expunged arrest in detail — including that Dr. Sunar was 'charged with misdemeanor child abuse and communicating threats' and that 'it was alleged that Sunar inflicted physical injury on a child younger than 16 years old.' This detailed republication of legally nullified allegations after the Expungement Order constitutes independent defamatory harm. Published on November 11, 2025, the Second Report falls squarely within the one-year statute of limitations regardless of any rule applicable to the First Report.

44. The Second Report was published at Dr. Sunar's attorney's request only because WBTV refused to remove the First Report. Acceptance of the Second Report as the only available option does not constitute a waiver of Dr. Sunar's legal rights and does not constitute consent to the continued publication of the First Report.

45. As of the date of this Amended Complaint, the Second Report remains live and publicly accessible and appears in Google search results for Dr. Sunar's name. Moreover, the Second Report has propagated beyond WBTV's own platform into national professional media. On November 13, 2025 — two days after publication — Dr. Bicuspid, a leading dental industry trade publication read by dentists, specialists, and referral sources nationwide, published an article sourced directly from the WBTV Second Report, repeating the association between Dr. Sunar and child abuse to his professional peers across the country. The article's own readers

recognized the unfairness: one commenter asked why the publication repeated the allegations "if nothing more is happening on this case," and another stated the story was "slanting" toward "an unfounded allegation." A true and correct copy of the Dr. Bicuspid article and reader comments is attached hereto as Exhibit J. This downstream propagation demonstrates that WBTV's Second Report — offered as a purported remedy — in fact amplified and spread the defamatory association into the very professional community upon which Dr. Sunar's livelihood depends.

## X. The Third Demand — November 2025

46. On November 26, 2025, Dr. Sunar personally wrote to WBTV and demanded that both the First Report and Second Report be removed from the WBTV website, de-indexed from Google searches, and that the Social Media Posts be deleted.

47. Defendants, through their counsel Lauren P. Russell of Ballard Spahr LLP — a national law firm specializing in media defense — responded by letter dated December 1, 2025, that WBTV stood behind its reporting and denied that any legal claim had merit. This response is significant because it establishes that the decision to continue publishing legally nullified charges was not merely the editorial judgment of a single non-legal executive, Rachel Bonilla, but the considered, legally counseled institutional position of Defendants — endorsed and ratified by sophisticated media defense counsel who had independently reviewed the expungement documentation and nonetheless advised continued publication. The willful intention to maintain defamatory content was thus exhibited at every level of Defendants' organization: from the Assistant News Director who verified

the expungement and refused removal, to outside legal counsel who reviewed the
same evidence and affirmed that refusal. A true and correct copy of the December
1, 2025 Ballard Spahr letter is attached hereto as Exhibit B.

48.  This third refusal — made after the complete dismissal of charges, after the
Expungement Order, after the Bonilla email confirmed WBTV's verified
knowledge of the expungement, and after the Second Report had been published
— conclusively establishes a documented institutional pattern of deliberate
refusal to take any remedial action regardless of changed legal circumstances.

49.  In total, Defendants received three formal demands for removal: in October 2024,
April 2025, and November 2025. They refused every single one. Each refusal was
made with progressively greater knowledge of the legal falsity of the content
being maintained. This pattern of deliberate, repeated refusal constitutes the
clearest possible evidence of actual malice and willful disregard for Dr. Sunar's
legal rights. Under N.C.G.S. § 99-1, a defendant's failure to publish a timely
retraction or correction may be considered in assessing punitive damages.
Defendants' three documented refusals over thirteen months preclude any
good-faith mitigation of punitive damages.


**XI. Queen City News Removes the Story — The Industry Standard**

50.  On November 12, 2025, Dr. Sunar contacted WJZY-TV and WMYT-TV —
competing Charlotte television stations operated by Nexstar Media, Inc. and doing
business as Queen City News — and provided the same expungement
documentation provided to WBTV.

51. On November 17, 2025 — five days later — Joseph McGuire, Vice President and General Manager of WJZY/WMYT, responded personally and in writing: 'This has been removed from our site.' A true and correct copy of Mr. McGuire's email is attached hereto as Exhibit C.

52. Queen City News — a direct competitor operating in the same Charlotte market under the identical First Amendment protections available to WBTV — made a reasonable editorial determination that a court-ordered expungement warranted removal of the original reporting. No litigation was required. No court order was required.

53. WBTV made the opposite decision. That decision was not constitutionally compelled, was not editorially required, and was not consistent with the standard of conduct demonstrated by a direct competitor in the same market. It was a deliberate institutional choice — made three times — to continue inflicting documented harm on a private citizen whose charges a court had declared never to have occurred.

54. The contrast between Queen City News's five-day removal and WBTV's nearly eighteen-month continued publication — and counting — is powerful evidence of the deliberate, willful, and malicious nature of Defendants' conduct. This contrast also refutes any claim that continued publication was constitutionally compelled or editorially reasonable. If the First Amendment required continued publication, Queen City News would have been required to maintain its article too. It was not. WBTV's refusal was a choice, not a constitutional imperative.

## XII. Ongoing Internet Publication and Continuing Harm

55. As of March 3, 2026 — nearly eighteen months after the First Report's original publication and nearly five months after the Expungement Order — both the First Report and the Second Report remain live, publicly accessible, and actively indexed by Google under Dr. Sunar's name. Additionally, a syndicated version of the First Report published by WIS News 10, an Instagram repost of the WBTV article, and the Dr. Bicuspid dental trade publication article referenced in paragraph 45 above all remain indexed in Google search results under Dr. Sunar's name. Plaintiff has obtained and preserved dated screenshots of Google search results confirming this ongoing publication, attached hereto as Exhibit D.

56. WBTV does not passively host the First Report as an archived historical document. WBTV actively maintains the article on a commercial website that generates advertising revenue from every page view, including page views of the First Report. WBTV actively optimizes its content for search engine indexing and discovery. Every day that WBTV maintains the First Report on its commercial website constitutes a deliberate, commercially motivated editorial decision to continue its publication for profit. This active commercial maintenance of defamatory content — not mere passive availability — is the operative publication act for purposes of any limitations analysis.

57. The ongoing internet publication of the First Report causes Dr. Sunar ongoing, continuous, and compounding harm each time the article is discovered by a patient, prospective patient, business partner, professional recruit, referral source, or any other person who searches Dr. Sunar's name online.

## XIII. Specific Documented Business and Personal Losses

### A. The Kilcrease Communication — Recruitment Destruction

58. In 2025, Dr. Sunar retained David Kilcrease, a professional dental practice recruiter, to identify qualified associate dentists for Charlotte Dental Implant Center.

59. The recruitment of qualified associates was and is material to Dr. Sunar's practice in two critical ways. First, a qualified associate generates approximately $500,000 to $1,000,000 in annual production revenue. Second, the presence of qualified associates directly increases the sale value of the practice. Plaintiff estimates that Defendants' interference with his recruiting efforts has reduced the eventual sale value of his practice by $1,500,000 to $2,500,000.

60. Mr. Kilcrease identified Dr. Munn as a highly qualified candidate for an associate position at Charlotte Dental Implant Center.

61. On October 16, 2025 — after the Expungement Order had been entered but while the First Report remained live on Google — Dr. Munn conducted a routine internet search of Dr. Sunar's name as part of her professional due diligence. The WBTV First Report appeared prominently in the Google search results. Upon discovering the First Report, Dr. Munn declined to pursue the associate position, specifically citing the WBTV child abuse article as the reason for her declination.

62. David Kilcrease documented Dr. Munn's declination and its stated reason in a written communication to Dr. Sunar dated October 16, 2025. A true and correct copy of the Kilcrease communication is attached hereto as Exhibit E.

63. Additionally, Dr. Precilla Lockhart, a second qualified candidate, also declined to pursue a position at Charlotte Dental Implant Center after discovering the WBTV articles during an internet search.

64. The declinations of Dr. Munn and Dr. Lockhart represent a documented pattern of candidate loss caused by the WBTV articles, confirming that the recruiting harm is systematic and ongoing — not limited to a single isolated instance. Additional candidate declinations will be documented through discovery.

65. The October 16, 2025 date of the Kilcrease communication is legally significant: it falls within one year of the filing of this action on December 10, 2025, establishing documented harm within the applicable limitations period, independently of any question regarding the original September 2024 publication date.

## B. The Genest Communication — $1.69 Million Investment Loss

66. Beginning in December 2023, Dr. Sunar made a substantial financial investment in Barbec Inc., completing his capital contributions by June 2024, a business venture in which he was promised a significant equity position as a condition of his investment. Dr. Sunar invested approximately $1.69 million in reliance on representations regarding his equity participation.

67. Following the publication of the First Report in September 2024, the attorney for Stéphane Genest, a principal of Barbec Inc., communicated in writing to Charlie Raphun that the WBTV story was the principal reason for excluding Dr. Sunar

from the shareholder agreement for Barbec Inc. A true and correct copy of this communication is attached hereto as Exhibit F.

68. This written communication constitutes contemporaneous, third-party documentary evidence establishing a direct causal link between the WBTV First Report and a specific, quantifiable business loss of approximately $1.69 million in equity value to which Dr. Sunar was contractually entitled.

69. Critically, the Genest attorney's October 2024 communication cited 'the optics' — meaning the public visibility created by the WBTV articles — not the underlying arrest itself, as the reason for Genest's hesitancy. Genest had known about the arrest since Dr. Sunar voluntarily disclosed it to him immediately after it occurred; what changed was WBTV's publication making it permanently visible to the public. The WBTV articles, not the arrest itself, were the operative cause of Dr. Sunar's exclusion from the Barbec shareholder agreement. The arrest was a temporary legal event that concluded in Dr. Sunar's favor with dismissal on April 7, 2025 and expungement on October 10, 2025. WBTV's articles are permanent and ongoing.

### C. The Genest Pretrial Conference — Articles Weaponized After Expungement

70. In approximately December 2025 or January 2026 — after the Expungement Order had been entered and after the charges had been legally declared never to have occurred — Dr. Sunar participated in a pretrial settlement conference in connection with litigation regarding the Barbec Inc. matter.

71. This was not the first time Genest weaponized the WBTV articles in legal proceedings. During a mediation conference in the Barbec litigation in approximately October 2025, Genest alluded to the WBTV arrest coverage despite having known about the underlying circumstances since Dr. Sunar voluntarily disclosed them immediately after the arrest. Then, during the pretrial settlement conference, Genest again raised the WBTV articles and specifically referenced 'the optics' of the WBTV child abuse articles still being online and searchable on Google. Genest used the existence and continued online availability of the WBTV articles as leverage against Dr. Sunar during the settlement conference — attempting to weaken Dr. Sunar's negotiating position by pointing to the ongoing reputational damage caused by Defendants' refusal to remove the articles.

72. This repeated use of the WBTV articles as a litigation weapon across multiple legal proceedings — occurring after the Expungement Order, after the charges were declared never to have occurred — establishes that Defendants' ongoing refusal to remove the First Report has created a permanent instrument of harm that Dr. Sunar's adversaries actively exploit against him. The harm is not historical. It is ongoing and actively being weaponized in 2026.

73. No mediator was present at this conference. The communications are not subject to any confidentiality privilege. Dr. Sunar's attorney, Pascal Lauzon, was present and can corroborate these facts.

**D. First Patient Witness — Cadi Putnam ($52,000 Treatment Plan)**

74. Cadi Putnam is a patient of Dr. Sunar who had agreed to a comprehensive dental treatment plan valued at $52,000. Ms. Putnam had already paid a deposit of $22,000 for pre-surgical preparation, demonstrating her commitment to the treatment relationship.

75. During the course of her treatment relationship with Dr. Sunar, Ms. Putnam conducted a routine internet search of Dr. Sunar's name. The WBTV First Report appeared in the Google search results.

76. Upon discovering the First Report, Ms. Putnam demanded to withdraw from her treatment program and requested that her $22,000 deposit be refunded — based solely on the content of the WBTV article.

77. Dr. Sunar was required to conduct an emergency conference call with Ms. Putnam and her husband to explain the circumstances of the arrest, the dismissal of all charges, and the entry of the Expungement Order. Only after this emergency call — and only after Dr. Sunar personally explained the truth that the WBTV article obscures — did Ms. Putnam agree to continue her treatment.

78. Ms. Putnam has provided a signed affidavit attesting to these facts and confirming her willingness to testify at trial. A true and correct copy of Ms. Putnam's affidavit is attached hereto as Exhibit G.

## E. Second Patient Witness — Rich Lam ($50,000 Treatment)

79. Rich Lam is a patient of Dr. Sunar who had commenced treatment including pre-surgical data collection and surgical planning for a procedure valued at

approximately $50,000. Mr. Lam had paid a deposit of $25,000 toward this treatment.

80. After commencing treatment, Mr. Lam discovered the WBTV First Report during an internet search of Dr. Sunar's name. Upon discovering the article, Mr. Lam came to Dr. Sunar's office in person and demanded a full refund of his $25,000 deposit, intending to withdraw from treatment entirely based solely on the content of the WBTV article.

81. During this in-person meeting at his office, Dr. Sunar personally explained to Mr. Lam the full circumstances of the arrest, the voluntary dismissal of all charges, and the entry of the Expungement Order declaring the charges never to have occurred. Only after this extensive one-on-one explanation did Mr. Lam agree to continue his treatment.

82. The timeline of Mr. Lam's incident is legally significant: his decision to withdraw from treatment occurred after the complete dismissal of all charges and after the entry of the Expungement Order. This establishes beyond dispute that the harm Dr. Sunar suffered was caused not by the arrest, but by WBTV's continued online publication of the First Report.

83. Mr. Lam has provided a signed affidavit attesting to these facts and confirming his willingness to testify at trial. A true and correct copy of Mr. Lam's affidavit is attached hereto as Exhibit H.

84. The Putnam and Lam incidents are not isolated occurrences. They represent a category of ongoing harm — patients and prospective patients who discover the

First Report during routine internet searches and make adverse decisions — that
multiplies across Dr. Sunar's entire patient base and cannot be fully quantified
without discovery of WBTV's analytics data.

### XIV. Psychiatric Harm — Suicidal Ideations and Ongoing Treatment

85.  As a direct and proximate result of Defendants' deliberate and ongoing publication
of legally false child abuse charges against him — and Defendants' documented,
repeated refusal to remove those charges despite three formal demands, a
court-ordered expungement, and the example of a competitor who removed
identical content within five days — Dr. Sunar has suffered severe psychological
harm requiring ongoing professional psychiatric care.

86.  Dr. Sunar experienced suicidal ideations as a direct result of the reputational
destruction, professional harm, financial losses, and personal humiliation caused
by Defendants' conduct. These ideations were severe enough to require Dr. Sunar
to seek psychiatric intervention.

87.  Dr. Sunar has been under the active care of a licensed psychiatrist as a result of this
harm. His psychiatrist has prescribed medication, which Dr. Sunar continues to
take under ongoing medical supervision as of the date of this Amended
Complaint.

88.  The psychiatric harm suffered by Dr. Sunar is not speculative or self-reported. It is
clinically documented by a licensed psychiatrist, confirmed by a prescription
medication regimen, and ongoing. The direct causal connection between

Defendants' conduct and Dr. Sunar's psychiatric harm will be established through the testimony of Dr. Sunar's treating psychiatrist and supporting medical records.

89.   Dr. Sunar — a 62-year-old healthcare professional who has served the Charlotte community with distinction for 24 years — was brought to the point of suicidal ideation by a billion-dollar media corporation's deliberate choice to continue broadcasting charges a court had declared never to have occurred. No financial accounting can fully capture the depth of this harm. But the law provides a remedy, and Plaintiff seeks it.

### XV. Inapplicability of Defendants' Anticipated Defenses

The following allegations directly address the legal defenses Defendants have raised and are anticipated to raise, establishing on the face of this Amended Complaint why those defenses fail as a matter of law.

### A. The Single Publication Rule Does Not Bar Plaintiff's Claims

90.   Defendants have argued that the single publication rule bars Plaintiff's claims arising from the First Report because more than one year elapsed between its original publication on September 12, 2024 and the filing of this action on December 10, 2025. This argument fails for three independent reasons.

91.   First, North Carolina appellate courts have not adopted the single publication rule. While the Fourth Circuit in Lokhova v. Halper, 995 F.3d 134 (4th Cir. 2021) noted that a majority of states follow the rule, it did not hold that North Carolina has

adopted it, and no binding North Carolina authority establishes this rule. This Court should not extend a limitations defense that North Carolina's own courts have not recognized.

92. Second, even in jurisdictions that recognize the single publication rule, the rule applies to passive hosting of unchanged content — not to active commercial publication. WBTV does not passively archive the First Report. WBTV actively publishes it on a revenue-generating commercial website, optimizes it for search engine discovery, and profits from every page view. Courts that have examined similar scenarios have distinguished active commercial maintenance from passive hosting. See Firth v. State, 98 N.Y.2d 365, 370 (2002) (single publication rule designed to prevent 'endless retriggering' of limitations for passive online archives; 'deliberate act' of republication falls outside the rule). WBTV's active commercial maintenance of the First Report after receiving verified notice of the Expungement Order constitutes an affirmative, deliberate editorial act — not passive continuation of an unchanged archive.

93. Third, and independently dispositive, specific documented harm fell within the one-year limitations period regardless of any publication date analysis. The Kilcrease communication documenting Dr. Munn's declination is dated October 16, 2025 — within one year of this action's December 10, 2025 filing date. The Second Report was published November 11, 2025 — within one year. The Bonilla email was sent November 6, 2025 — within one year. The Genest pretrial conference occurred in December 2025 or January 2026 — within one year. Each

of these constitutes a separately cognizable harm within the limitations period,

independently of any question about the original First Report publication date.

### B. The Fair Report Privilege Does Not Protect Post-Expungement Continued Publication

94.   Defendants argue that the fair report privilege shields their publications from

liability. This argument misapprehends the scope and purpose of the privilege.

95.   The fair report privilege protects accurate, contemporaneous reporting on official

proceedings, actions, and records. See Desmond v. News & Observer Publ'g Co.,

241 N.C. App. 10 (2015). The privilege exists because the public has an interest

in accurate information about official governmental actions at the time those

actions occur.

96.   The privilege does not provide perpetual immunity for continued publication of

content that has become legally false through subsequent judicial action. The

Expungement Order is not merely a change in legal status — it is a judicial

declaration that the underlying events never occurred as a matter of North

Carolina law. Once a court declares that the events underlying a news report never

happened, the public interest that justified the original fair report no longer exists.

There is no public interest in accurate reporting about events that a court has

declared never to have occurred.

97.   More fundamentally, the fair report privilege applies to accurate reports of official

documents and proceedings — it does not authorize publication of content that

contradicts official judicial declarations. The Expungement Order is itself an official judicial document. A news organization that continues to publish charges after a court has judicially declared those charges never to have occurred is not publishing a 'fair report' of official records — it is publishing content that directly conflicts with the most recent and authoritative official record: the Expungement Order itself.

98.  The privilege also does not protect malicious publication. As the Bonilla email establishes, WBTV knew the charges had been expunged, verified this fact, and chose continued publication anyway. A publisher that knowingly maintains false content after judicial notification of its falsity cannot invoke a privilege designed to protect good-faith contemporaneous reporting.

99.  The McLaughlin v. Darlington County, 2021 WL 4691379 (D.S.C. Sept. 17, 2021) case that Defendants cited in their Motion to Dismiss is distinguishable on its material facts: that case involved no expungement order, no verified written acknowledgment of falsity, no pattern of three formal refusals over thirteen months, and no competing broadcaster that removed identical content. None of the conditions establishing actual malice present here existed in McLaughlin.

**C. Truth Is Not a Defense to Post-Expungement Publication Made with Actual Malice**

100.  Defendants argue that truth is a complete defense because the First Report accurately reported what official records showed at the time of publication. This defense fails post-expungement.

101. The truth defense in defamation law applies to the truth of the statement at the time the challenged publication was made — not the truth of a statement made years earlier. After October 10, 2025, WBTV was not republishing a true historical fact. It was actively publishing, on a commercial website, content stating that Dr. Sunar had been arrested and charged with child abuse — when a court had judicially declared those events never to have occurred. The question is not whether the original 2024 report was true in 2024. The question is whether continued publication in 2025 and 2026 is true. It is not. A court of law has said so.

102. Moreover, the truth defense cannot coexist with the Bonilla email. A publisher that acknowledges in writing that charges have been expunged — meaning a court has declared they never occurred — and then continues to publish those charges as present fact, is not publishing the truth. It is publishing content it knows to be legally false. The Bonilla email destroys the truth defense as a matter of evidence.

### D. The Second Report Bears Independent Defamatory Meaning

103. Defendants argue that the Second Report lacks defamatory meaning because it states the charges were 'dropped' and 'expunged.' This argument ignores how internet publishing works in practice.

104. The Second Report's headline — 'Charges dropped against Charlotte dentist accused of child abuse in 2024' — is what appears in Google search results. The headline permanently brands Dr. Sunar as a man 'accused of child abuse.' The word 'dropped' does not exonerate; it implies the charges existed and were merely

procedurally dismissed, leaving the core accusation — child abuse — permanently attached to Dr. Sunar's name in every internet search. A reasonable reader — indeed, the majority of internet users who encounter this headline through a search engine snippet — does not read exoneration in this headline. They read: Charlotte dentist, accused, child abuse. That association is defamatory per se.

105.    Furthermore, the Second Report's body text republishes in detail the specific allegations of the expunged charges — including that Dr. Sunar 'inflicted physical injury on a child younger than 16 years old.' A report that states charges were cleared while simultaneously republishing the detailed underlying allegations in full is not a neutral exculpatory report. It is a republication of defamatory content dressed in superficially remedial language.


**E. Defendants' Own Exhibit Establishes Plaintiff's Damages — Not Newsworthiness**

106a.    Defendants attached the WBTV Facebook Social Media Posts and associated public commentary as Exhibit 2 to their Motion to Dismiss (ECF 8-3). The strategic purpose of this attachment is apparent: Defendants seek to use the public's visceral reaction to the child abuse accusation — including comments calling for Dr. Sunar's permanent imprisonment — to argue that the reporting addressed a matter of genuine public concern, that the arrest was real and newsworthy, and that the continued publication of the First Report is therefore protected editorial conduct notwithstanding the Expungement Order.

106b.    This strategy fails as a matter of law for two independent reasons. First, the physical fact that an arrest occurred in 2024 is not disputed. The Expungement Order does not erase physics — it creates a judicial declaration that as a matter of North Carolina law those events are deemed never to have occurred. The question before this Court is not whether an arrest happened in 2024. The question is whether WBTV may continue to commercially publish and financially benefit from those charges in 2025 and 2026 after a court has judicially declared them never to have occurred, with full written knowledge of that declaration, having refused three formal demands for removal. The public's 2024 reaction to 2024 charges does not answer that question.

106c.    Second, and more fundamentally, the exhibit Defendants introduced as evidence of newsworthiness is in fact the most powerful evidence of Plaintiff's damages in this case. The Facebook commentary Defendants attached as ECF 8-3 shows, in the public's own words, exactly what WBTV's reporting did to Dr. Sunar's reputation in his own community: strangers who had never met him called for his permanent imprisonment based entirely on WBTV's article — charges a court later declared never to have occurred. That is not evidence that the reporting was justified. That is evidence that the harm was catastrophic, immediate, and community-wide. By introducing ECF 8-3 into the federal record, Defendants have themselves established the scope and severity of the reputational destruction their continued publication has caused. Plaintiff accepts this evidence gratefully and will rely upon it at trial.

106d.    Furthermore, the same exhibit contains its own rebuttal. Prominent members of the Charlotte community who personally knew Dr. Sunar came to his public defense on WBTV's own platform — rejecting the reporting as unjust, vouching for his character

and standing, and demonstrating that those with actual knowledge of Dr. Sunar viewed WBTV's narrative as an attack on a respected professional. The fact that community leaders felt compelled to publicly defend Dr. Sunar on WBTV's own Facebook page is itself evidence of the depth of Dr. Sunar's reputation in Charlotte and the degree to which the reporting was perceived locally as unjust. Defendants introduced this evidence. It belongs to Plaintiff now.

### F. Defendants' Three Exhibits, Read Together, Establish Plaintiff's Case — Not Defendants' Defense

107a.    Defendants attached three exhibits to their Motion to Dismiss: Exhibit 1 (the First Report of September 12, 2024), Exhibit 2 (the Facebook Social Media Posts and public commentary), and Exhibit 3 (the Second Report of November 11, 2025). Defendants introduced these exhibits to support their defenses of fair report privilege, truth, and lack of defamatory meaning. Read carefully against those defenses, all three exhibits fail to support Defendants' position — and in critical respects, they affirmatively establish Plaintiff's claims.

107b.    Exhibit 1 — The First Report — Exceeds the Scope of the Fair Report Privilege. The fair report privilege protects substantially accurate, neutral reporting on official proceedings. See LaComb v. Jacksonville Daily News Co., 543 S.E.2d 219, 222 (N.C. Ct. App. 2001). It does not protect sensationalized editorial framing that goes beyond what official records state. The First Report, as introduced by Defendants themselves as ECF 8-1, does not merely report the existence of charges. It embeds those charges in a narrative framework designed to convey guilt: prominently displaying Dr. Sunar's

mugshot as the primary visual element; broadcasting video footage of handcuffs — a visceral symbol of criminal guilt — that appears nowhere in the official charging documents; using language and framing that telegraphs to a reasonable viewer that authorities have finally apprehended a dangerous criminal, not merely that charges have been filed. Official charging documents state facts. They do not display handcuffs. They do not editorially frame an accused person as someone authorities have 'finally caught.' That editorial embellishment — introduced into this case by Defendants' own exhibit — is not protected by the fair report privilege, which requires neutral accuracy, not sensationalized amplification of official records.

107c.   Exhibit 1 Further Demonstrates Actual Malice Through Its Framing. The deliberate editorial choices reflected in the First Report — the mugshot prominence, the handcuff imagery, the guilt-implying narrative tone — are not neutral journalistic decisions. They are choices designed to maximize the reputational damage of the reporting. A news organization that makes deliberate editorial choices to maximize the stigmatizing impact of a criminal accusation, and then refuses to correct that stigma after a court declares the accusation never to have occurred, demonstrates not good-faith journalism but institutional indifference to the truth driven by commercial gain — every sensationalized editorial choice that maximizes reputational damage simultaneously maximizes audience engagement and advertising revenue. The First Report's sensationalized framing, combined with the Bonilla email's documented refusal to remove it post-expungement, establishes actual malice with particular force.

107d.   Exhibit 2 — The Facebook Posts — Establishes the Scope of Plaintiff's Damages, Not the Justification for Defendants' Conduct. As established in Section XV.E

above, Defendants introduced Exhibit 2 to suggest that the public's visceral reaction to the child abuse accusation demonstrates the reporting's newsworthiness. This argument is legally unavailing for the reasons stated in Section XV.E. What Exhibit 2 indisputably establishes is the community-wide, immediate, and devastating reputational destruction that WBTV's reporting caused: strangers calling for Dr. Sunar's permanent imprisonment based on charges a court later declared never to have occurred. That is not a defense. It is an exhibit establishing Plaintiff's damages. Plaintiff will rely upon ECF 8-3 at trial.

107e.  Exhibit 3 — The Second Report — Is Independently Defamatory on Its Face. Defendants introduced Exhibit 3 to demonstrate that the Second Report exonerated Dr. Sunar and therefore cannot be defamatory. This argument fails for the reasons stated in Section XV.D above. But Defendants' own exhibit makes the point more powerfully than any legal argument can: the headline of the Second Report — as introduced by Defendants themselves — reads 'Charges dropped against Charlotte dentist accused of child abuse in 2024.' That is the text a Google user sees. That is the text that appears in search results for Dr. Sunar's name. That headline does not exonerate. It permanently brands. The words 'accused of child abuse' are the operative phrase in every search result, every social media share, and every professional background search that encounters this article. Defendants introduced this headline into the federal court record. It speaks for itself.

107f.  Read Together, Defendants' Three Exhibits Tell Plaintiff's Story. Exhibit 1 shows sensationalized, guilt-implying reporting that goes beyond what fair report privilege protects. Exhibit 2 shows the catastrophic community-wide reputational destruction that reporting caused. Exhibit 3 shows a follow-up publication that, despite facially reporting

the charges were cleared, permanently brands Dr. Sunar with child abuse accusations in every internet search. That is not a defense package. That is the documented record of an eighteen-month campaign of reputational destruction — from the sensationalized original report, through the community condemnation it generated, to the inadequate follow-up that perpetuates the brand of 'accused child abuser' in perpetuity. Throughout this eighteen-month period, Defendants have derived continuous commercial gain from the very content their own exhibits document. Defendants introduced all three exhibits. Plaintiff accepts them as evidence of his damages and will rely upon them at trial.

**G. Defendants' Publications Are Commercial Clickbait — Not Protected Journalism**

108a.    This Court should understand the precise commercial mechanism by which Defendants have profited — and continue to profit — from the destruction of Dr. Sunar's reputation. WBTV does not publish news as a public service. WBTV publishes news on a commercial website — www.wbtv.com — that generates advertising revenue from every single page view. The First Report, as introduced by Defendants as ECF 8-1, was not designed merely to inform the public. It was engineered to maximize audience engagement and therefore advertising revenue: a mugshot as the primary visual element, handcuff video footage, the phrase 'child abuse' repeated throughout, and a headline specifically designed to trigger the emotional response that drives clicks. This is the architecture of clickbait — content deliberately constructed to generate maximum audience engagement for maximum commercial return.

108b.    Every editorial choice that maximizes the sensational impact of the First Report simultaneously maximizes advertising revenue. The mugshot drives clicks. The handcuff

video drives clicks. The phrase 'child abuse' — repeated, prominent, emotionally charged — drives clicks. Each click generates revenue for a billion-dollar media corporation. Dr. Sunar's professional destruction is WBTV's monetized content. His ruined reputation is their inventory. His suffering is their profit margin. This is not journalism protected by the First Amendment. This is commercial exploitation of a private citizen's worst moment, engineered for profit, and maintained for profit long after a court declared the underlying events never to have occurred.

108c.    The commercial motivation for continued publication is directly relevant to the actual malice analysis and to punitive damages. A news organization that maintains defamatory content on a revenue-generating platform after receiving verified judicial notice of its falsity is not making an editorial judgment about the public's right to know. It is making a commercial calculation that the revenue generated by continued publication outweighs the cost of removal. That calculation — profit over truth, advertising revenue over a private citizen's judicially-restored legal status — is actual malice in its most transparent form. The Bonilla email confirms this calculation in writing: WBTV verified the expungement, acknowledged it internally, and chose continued commercial publication anyway. 'Due to the accuracy of the original post, no removal is warranted' is not a legal defense. It is a commercial decision dressed in editorial language.

108d.    The contrast with Queen City News makes the commercial calculus undeniable. Queen City News — operating under the identical First Amendment protections, in the identical Charlotte market, with the identical advertising revenue model — removed the story within five days of a humble request. Queen City News chose integrity over inventory. WBTV chose revenue over truth. That choice — documented across three

formal refusals over thirteen months, confirmed in writing by WBTV's own Assistant News Director — is the definition of willful and wanton conduct warranting punitive damages under North Carolina law. A corporation that commercially profits from legally false child abuse accusations against a private citizen, after a court has declared those accusations never to have occurred, and after a direct competitor has demonstrated that removal is both feasible and consistent with First Amendment obligations, has forfeited any claim to good-faith editorial protection.

108e.    Plaintiff respectfully submits that this Court should consider, in assessing punitive damages, the full commercial benefit Defendants have derived from nearly eighteen months of continued publication of the First Report. WBTV's own analytics data — subpoenable in discovery — will establish precisely how many times the First Report has been accessed, how much advertising revenue each page view generated, and therefore the precise commercial profit Defendants extracted from Dr. Sunar's destroyed reputation. Punitive damages should reflect not only the harm caused to Plaintiff but also the profit gained by Defendants. A punitive award that merely equals Defendants' revenue from the First Report would provide no deterrence. A meaningful punitive award must exceed that profit to ensure that commercial exploitation of judicially nullified criminal accusations against private citizens is not a viable business model for billion-dollar media corporations.

108f.    The continued publication of the First Report is not a passive act of archival journalism. It is powered by sophisticated, profit-driven algorithmic systems that Defendants have deliberately deployed to maximize commercial return. Modern digital media platforms — including www.wbtv.com — operate through complex proprietary

algorithms engineered for a single purpose: to drive traffic, maximize engagement, and generate advertising revenue. These algorithms do not distinguish between a news article about a public official and a legally nullified child abuse accusation against a private citizen. They are optimized for clicks and commercial gain. They amplify content that generates emotional responses. They serve the First Report to new audiences automatically — to anyone who searches Dr. Sunar's name, to anyone who reads adjacent dental or Charlotte news content, to anyone whose browsing history makes them a target demographic for WBTV's advertising inventory. Every time these algorithms serve the First Report to a new reader, WBTV earns revenue. Dr. Sunar's legally nullified child abuse accusation is an algorithmically optimized commercial product — generating profit for Defendants on autopilot to the date of this filing — nearly eighteen months after a court declared the underlying events never to have occurred.

108g.    This algorithmic commercial machinery transforms the character of Defendants' conduct from passive publication to active, automated, continuous republication. The single publication rule — even in jurisdictions that recognize it — was designed to protect publishers from endless retriggering of limitations based on the passive availability of archived content. It was not designed to immunize a billion-dollar media corporation's deliberate deployment of profit-driven algorithms that actively push legally nullified criminal accusations to new audiences every day for commercial gain. When Defendants' own algorithmic systems automatically serve the First Report to Dr. Munn during her professional due diligence search in October 2025 — six days after the expungement — that is not passive archiving. That is active, automated, commercially motivated republication. Defendants cannot simultaneously profit from their algorithms'

active distribution of the First Report and claim the protections designed for passive archivists.

108h.    What was once journalism has become something else entirely. The original September 12, 2024 broadcast — whatever its deficiencies — at least occurred in the context of a contemporaneous news event. What exists today, nearly eighteen months later, is categorically different: an algorithmically amplified, commercially monetized, search-engine-optimized product designed to surface child abuse accusations against a private citizen whenever anyone searches his name — accusations that a court has declared never to have occurred, that a direct competitor removed within five days of a humble request, and that three formal demands over thirteen months have failed to dislodge. This is not journalism. This is not protected editorial judgment. This is a profitable business decision to commercially exploit a private citizen's worst moment — a moment a court has legally erased — for advertising revenue. Dr. Ramesh Sunar is not a public figure. He is a 62-year-old dentist who spent 24 years building a reputation of clinical excellence and community service in Charlotte, North Carolina. He is not inventory. He is not a revenue stream. He is a human being whose legal rights this Court has the power and the obligation to protect.

## CAUSES OF ACTION

### COUNT I — DEFAMATION PER SE

### (First Report and Social Media Posts)

109.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

110.   The First Report and Social Media Posts identify Dr. Sunar by name, photograph, and professional affiliation and accuse him of child abuse and physical violence against a child. These publications constitute defamation per se under North Carolina law because they falsely impute to Dr. Sunar the commission of a crime involving moral turpitude and because they prejudice Dr. Sunar in his profession as a licensed healthcare provider.

111.   Following entry of the Expungement Order on October 10, 2025, the statements in the First Report became legally false. The Expungement Order declared the underlying events never to have occurred as a matter of North Carolina law. Continued publication of these statements after that date is publication of legally false content.

112.   Defendants published and continue to publish the First Report with actual malice as established by the Bonilla email — a written, contemporaneous, institutional acknowledgment of the expungement combined with a deliberate decision to continue publication. Three formal demands for removal, each refused over thirteen months, further establish the deliberate and knowing nature of this continued publication.

113.   The single publication rule does not bar claims arising from the First Report for the three independent reasons set forth in Section XV.A above, incorporated herein by reference.

114. The fair report privilege does not shield Defendants' continued post-expungement publication for the reasons set forth in Section XV.B above, incorporated herein by reference.

115. Truth is not a defense to Defendants' continued post-expungement publication for the reasons set forth in Section XV.C above, incorporated herein by reference.

116. As a direct and proximate result of the defamatory First Report and Social Media Posts, Plaintiff has suffered damages including but not limited to: the $1.69 million Barbec equity loss; the loss of associate candidates Dr. Munn and Dr. Lockhart; patient losses represented by Putnam and Lam; practice valuation reduction of $1.5 to $2.5 million; loss of referrals and new patient revenue; and severe psychological harm including suicidal ideations requiring ongoing psychiatric treatment.


## COUNT II — DEFAMATION

### (Second Report)

117. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

118. The Second Report constitutes an independently defamatory publication. Its headline permanently associates Dr. Sunar's name with child abuse accusations in every Google search result. Its body republishes the core factual allegations of the expunged arrest in detail. The defamatory meaning of the Second Report is

established by the analysis in Section XV.D above, incorporated herein by reference.

119. The Second Report was published on November 11, 2025, within one year of the filing of this action. Claims arising from the Second Report are timely under any applicable limitations period.

120. Defendants published the Second Report with actual malice. The editorial decision to publish a headline permanently branding Dr. Sunar with child abuse accusations — rather than removing the First Report as requested — reflects the same institutional disregard for Dr. Sunar's legal rights documented in the Bonilla email and the pattern of three refusals.

121. As a direct and proximate result of the defamatory Second Report, Plaintiff has suffered the same categories of ongoing and compounding harm described in Count I.

## COUNT III — TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

122. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

123. At all relevant times, Dr. Sunar maintained specific existing and prospective business relationships with patients, professional recruits, referral sources, and business partners, including the specific relationships described herein.

124. Defendants intentionally and without justification interfered with these specific business relationships through deliberate post-expungement republication of

legally false charges. Because the published charges had been declared by a court never to have occurred, Defendants' conduct is not protected by any privilege applicable to the publication of truthful information. Unlike cases involving truthful reporting, Defendants here continued to publish content they had verified to be legally false — content a court had declared never to have happened. There is no privilege for intentional publication of judicially declared falsehoods.

125. Defendants' tortious interference is established by five specific documented instances: (1) the Kilcrease communication documenting Dr. Munn's declination; (2) the declination of Dr. Precilla Lockhart; (3) the Genest attorney communication establishing the $1.69 million equity loss; (4) the Cadi Putnam incident; and (5) the Rich Lam incident.

126. As a direct and proximate result of Defendants' tortious interference, Plaintiff has suffered actual damages in an amount to be determined at trial, estimated to be not less than $3,000,000 based on the five documented instances alone.


## COUNT IV — INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

127. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

128. Defendants' conduct as described herein constitutes extreme and outrageous conduct that goes beyond all possible bounds of decency. The outrageous conduct is not the original publication — it is the deliberate, institutionally-sanctioned pattern of refusal: receiving written judicial proof that charges never occurred,

verifying this fact in their own words, watching a direct competitor remove identical content within five days of a humble request, receiving three formal demands over thirteen months, and still choosing — deliberately and repeatedly — to continue broadcasting the legally nullified charges. No reasonable person would regard this conduct as anything other than willful and unconscionable.

129.   Defendants acted intentionally or with reckless disregard for the probability that their conduct would cause severe emotional distress to Dr. Sunar.

130.   As a direct and proximate result of Defendants' extreme and outrageous conduct, Dr. Sunar has suffered severe emotional distress clinically documented by a licensed psychiatrist, including suicidal ideations and ongoing prescription treatment. This is physician-verified, medication-confirmed, ongoing clinical harm directly caused by Defendants' deliberate conduct.

## COUNT V — NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

131.   Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

132.   Defendants owed Dr. Sunar a duty of reasonable care in the maintenance of content about him on their commercial platform, including a duty to take reasonable remedial steps upon receiving verified written notice that published content had become legally false following a court-ordered expungement.

133. Defendants breached this duty by continuing to publish the First Report without correction, annotation, or removal after receiving verified written notice of the Expungement Order and three formal demands for removal over thirteen months.

134. Defendants' breach was the direct and proximate cause of severe, clinically documented emotional distress to Dr. Sunar, including suicidal ideations and ongoing psychiatric treatment.

## COUNT VI — TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

135. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

136. Beyond the five specifically documented instances described in Count III, Defendants' ongoing publication of the First Report has broadly and continuously interfered with Dr. Sunar's prospective economic advantage in attracting new patients, recruiting qualified associates, developing professional referral relationships, and pursuing business opportunities in the Charlotte market.

137. Defendants' interference with Dr. Sunar's prospective economic advantage was deliberate, knowing, and without justification — as established by the documented pattern of three refusals, the Bonilla email, and the contrast with Queen City News's conduct.

## DAMAGES

138. As a direct and proximate result of Defendants' conduct as described herein,
Plaintiff Dr. Ramesh K. Sunar has suffered the following categories of damages:

139. Documented economic damages: (a) Loss of $1.69 million Barbec equity position,
documented in writing; (b) Loss of associate recruiting candidates Dr. Munn and
Dr. Lockhart, with estimated lost production revenue of $500,000 to $1,000,000
per associate per year; (c) Practice valuation reduction of $1,500,000 to
$2,500,000; (d) Patient losses from Putnam ($52,000) and Lam ($50,000)
incidents; (e) Systemic loss of new patient acquisition and referrals across the
nearly eighteen-month publication period. Plaintiff estimates total documented
and reasonably calculable economic damages in excess of $40,000,000.

140. Non-economic damages: Severe damage to professional reputation built over 24
years of practice; permanent public association of Dr. Sunar's name with child
abuse accusations in Google search results; severe psychological harm including
suicidal ideations and ongoing psychiatric treatment; humiliation, anxiety, loss of
sleep, and loss of enjoyment of professional and personal life. Plaintiff estimates
total non-economic damages in excess of $25,000,000.

141. Punitive damages: Defendants' conduct — specifically the documented
institutional decision to continue broadcasting legally nullified child abuse
charges after written verification of their nullification, after three formal demands
for removal, after a court-ordered expungement, and in deliberate contrast to the
remedial action taken by a direct competitor — constitutes willful, wanton, and
malicious conduct warranting an award of punitive damages. Defendants' three
documented refusals to publish any correction or retraction, as documented in the

Bonilla email and the December 1, 2025 Ballard Spahr letter, preclude any

good-faith mitigation of punitive damages. Plaintiff seeks punitive damages in

excess of $15,000,000.

142.    Plaintiff further seeks injunctive relief requiring Defendants to immediately

remove the First Report, Second Report, and Social Media Posts from all

platforms, and to take all reasonable steps to de-index this content from Google

and all other search engines.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Dr. Ramesh K. Sunar respectfully requests that this Court:


143.    Enter judgment in favor of Plaintiff on all Counts of this Amended Complaint;

144.    Award Plaintiff compensatory damages in an amount to be determined at trial but

not less than $80,000,000;

145.    Award Plaintiff punitive damages in an amount to be determined at trial reflecting

the willful, wanton, and malicious nature of Defendants' conduct;

146.    Order Defendants to immediately and permanently remove the First Report,

Second Report, and all Social Media Posts from all platforms owned, operated, or

controlled by Defendants;

147.    Order Defendants to take all reasonable and technically available steps to de-index

the First Report and Second Report from Google and all other search engines;

148.    Award Plaintiff his costs of this action; and

149.   Grant such other and further relief as this Court deems just and proper.


## JURY DEMAND

Plaintiff Dr. Ramesh K. Sunar hereby demands a trial by jury on all issues so triable

pursuant to Federal Rule of Civil Procedure 38.


Respectfully submitted,


DR. RAMESH K. SUNAR

Plaintiff, Pro Se

2809 Coltsgate Road, Suite 210

Charlotte, NC 28211

(704) 957-5938

rsunar@yahoo.com


Dated: _March 10th_, 2026


## LIST OF EXHIBITS

Exhibit A — Order of Expunction, Mecklenburg County Superior Court, October 10,

2025

Exhibit B — Bonilla Email Chain and Ballard Spahr Response Letter, November 2025 – December 1, 2025

Exhibit C — McGuire Email, Queen City News, November 17, 2025

Exhibit D — Google Search Screenshots, dated March 3, 2026

Exhibit E — Kilcrease Communication, October 16, 2025

Exhibit F — Genest Attorney Communication regarding Barbec Inc.

Exhibit G — Affidavit of Cadi Putnam

Exhibit H — Affidavit of Rich Lam

(Exhibit I — not separately filed; WBTV Social Media Posts and Public Comments previously filed by Defendants as ECF 8-3)

Exhibit J — Dr. Bicuspid Article, "Dentist cleared of abuse charge," November 13, 2025, with Reader Comments

## CERTIFICATE OF SERVICE

I hereby certify that on _March 10th_, 2026, I served a true and correct copy of the foregoing Amended Complaint upon the following counsel of record via electronic mail and U.S. mail:

Lauren P. Russell

Ballard Spahr LLP

1909 K Street NW, 12th Floor

Washington, DC 20006

russelll@ballardspahr.com

DR. RAMESH K. SUNAR