FILED
CHARLOTTE, NC

APR 0 8 2026

US DISTRICT COURT
WESTERN DISTRICT OF NC

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF NORTH CAROLINA

CHARLOTTE DIVISION

Case No. 3:26-cv-00129-KDB-DCK

DR. RAMESH K. SUNAR,

              Plaintiff,

v.

GRAY MEDIA, INC. (formerly GRAY

TELEVISION INC.) and

GRAY LOCAL MEDIA, INC., d/b/a WBTV,

              Defendants.

## PLAINTIFF'S BRIEF IN OPPOSITION TO

## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

### INTRODUCTION

On November 6, 2025, Defendants' own News Director, Rachel Bonilla, wrote to Plaintiff's attorney: "We've been able to verify that the charges have been expunged." In the same email, Ms. Bonilla stated: "No removal is warranted." Five days later, a competitor in the same Charlotte market—Queen City News (WJZY)—received the same information about the expungement and removed its coverage entirely. Defendants chose a different path: continued

1

publication, sensationalized republication, and, ultimately, legal threats against the pro se Plaintiff who spent thirteen months begging for relief.

Defendants characterize the Amended Complaint as a defiant refiling and suggest Plaintiff is litigious. The record reflects the opposite. Before filing suit, Dr. Sunar spent over thirteen months attempting to resolve this matter without litigation—through a personal email to Defendants on April 16, 2025 (Ex. K), voicemail messages to Defendants' newsroom, and formal attorney communications in October 2025. (Am. Compl. ¶¶ 20–23, 35–39.) At every turn, Defendants either ignored him or refused relief. The Amended Complaint itself was filed pursuant to this Court's express grant of leave to amend (ECF 11), after Defendants' own initial Motion to Dismiss was denied as moot for having been filed in violation of this Court's Standing Order. The Court "respectfully encouraged" Plaintiff to consider Defendants' arguments—and Plaintiff did, addressing each one in a substantially revised pleading that incorporates new evidence, narrows claims by dropping the statutory violation cause of action, and responds directly to the arguments Defendants raised.

This case is not about the historical fact of Dr. Sunar's arrest, which he has never disputed. This case is about the conduct of Gray Media, Inc.—a publicly traded corporation valued at approximately $7 billion—which verified in writing that criminal charges against Dr. Sunar had been expunged by court order, refused to remove the publication, and continues to commercially exploit an article featuring Dr. Sunar's mugshot and child abuse allegations that North Carolina law has declared legally nonexistent.

On April 16, 2025—nine days after the voluntary dismissal of all charges—Dr. Sunar personally emailed Defendants, stating: "I employ several people who depend on me for their livelihood too. I have lost significant income because of this story." (Ex. K.) He acknowledged

2

Defendants' First Amendment rights and asked for removal or, alternatively, a parallel story reporting the dismissal. Defendants did not respond. Six months later, when Dr. Sunar's attorney raised the same concerns, Defendants verified the expungement and refused removal. Defendants then published a Second Report—republishing the expunged allegations under a headline leading with "accused of child abuse"—without sharing a draft or seeking any input from Dr. Sunar or his attorney. This Second Report was subsequently indexed by Google and republished by Dr. Bicuspid, a nationally circulated professional dental publication, extending the harm from the Charlotte market into the national dental profession. (Am. Compl. Ex. J.)

This case presents a narrow question that none of Defendants' cited authorities address: whether a media publisher's deliberate continued commercial publication of expunged charges—after verified written knowledge of expungement, after direct personal notice of specific harm, and where a competitor removed identical content within five days of learning the same information—states a claim for defamation under North Carolina law. Plaintiff respectfully submits that it does, and that the Motion to Dismiss should be denied.

## I.

## DEFENDANTS' CITED AUTHORITIES ARE INAPPOSITE

Defendants' brief relies principally on three authorities to argue that expungement cannot render continued publication actionable: *Martin v. Hearst Corp.*, 777 F.3d 546 (2d Cir. 2015); *Smith v. InformData, LLC*, 2026 WL 688957 (E.D. Va. Mar. 11, 2026); and *McLaughlin v. Darlington Cnty.*, 2021 WL 4691379 (D.S.C. Sept. 17, 2021). Each is distinguishable on multiple grounds. Critically, none addresses the fact pattern alleged here: a publisher who received written verification of expungement, confirmed it independently, made a deliberate

editorial decision to continue publishing, and whose competitor in the same market removed identical content within five days.

In *Martin*, the Second Circuit held that Connecticut's Criminal Records Erasure Statute does not independently render historically accurate news accounts of an arrest defamatory. 777 F.3d at 551. The court's holding was expressly grounded in the scope of the Connecticut statute, which the court found "only requires that certain official records be erased" and does not "impose requirements on persons who work outside courts or law enforcement agencies." *Id.* at 550.

*Martin* is inapposite for at least five reasons. First, the *Martin* defendants had no direct communication with the plaintiff regarding the expungement. The newspapers simply left archived articles online. There was no equivalent of the Bonilla email—no written verification of expungement by the publisher. Second, there was no evidence that the publishers made a deliberate, documented editorial decision to continue publishing after acquiring knowledge of the expungement. Third, there was no comparator—no competitor outlet in the same market that received the same information and voluntarily removed its coverage. Fourth, the plaintiff in *Martin* raised no actual malice argument based on the publisher's verified knowledge. Fifth, *Martin* was decided on summary judgment with a fully developed factual record, not at the 12(b)(6) stage where all allegations are accepted as true.

Plaintiff does not contend that the expungement statute independently creates defamation liability. Plaintiff brings common law defamation claims under North Carolina law, in which the expungement order informs the falsity and actual malice analysis. The question *Martin*

4

answered—whether an expungement statute alone converts archived news into defamation—is not the question before this Court.

*Smith* involved a background check data aggregator that compiled bulk public records and sold them to employers. 2026 WL 688957, at *1. The defendant, InformData, had no relationship with the plaintiff, no direct communication with the plaintiff, and—critically—no knowledge of the expungement. The court specifically noted that "there were no public records of the expungement" available for the defendant to discover. *Id.* at *9.

This case is the polar opposite. WBTV is a media publisher that engaged in direct correspondence with Plaintiff's counsel, independently verified the expungement, and made a deliberate editorial decision to continue publishing. The question in *Smith* was whether a passive data compiler's failure to discover an expungement constitutes defamation. The question here is whether a media publisher's deliberate continued publication after verified knowledge of the expungement order constitutes defamation. These are fundamentally different questions, and *Smith* does not address the latter.

*McLaughlin is a Magistrate Judge's Report and Recommendation in a pro se screening case involving charges that were dismissed but not expunged—a legally distinct status. 2021 WL 4691379, at *1. Under N.C.G.S. § 15A-146, expungement means records are erased and the person may deny the arrest without penalty of perjury. McLaughlin had no such protection, no documented communication with the publisher, no verified knowledge, and no comparator outlet. Its persuasive weight is minimal—a routine screening dismissal, not a fully briefed appellate opinion.*

Defendants' remaining citations on the truth defense—including Lee v. TMZ Prods., Inc., 710 F. App'x 551 (3d Cir. 2017), Bell v. Associated Press, 584 F. Supp. 128 (D.D.C. 1984), and Lacomb v. Jacksonville Daily News Co., 142 N.C. App. 511 (2001)—apply the fair report privilege in standard settings where the publisher had no knowledge that the underlying proceedings had been legally nullified. None confronts a publisher who verified an expungement in writing and continued to publish. These authorities do not control the question before this Court.

### D. No Court Has Addressed the Fact Pattern Alleged Here.

Defendants ask this Court to treat these authorities as controlling. But no court—in the Fourth Circuit or elsewhere—has addressed a case where a publisher: (1) received written verification of expungement from its own news director; (2) independently confirmed the expungement; (3) refused removal; (4) published a second article republishing the expunged allegations without the subject's review; (5) continued commercial publication of the First Report alongside the Second Report; and (6) operated in a market where a competitor removed identical content within five days. This is a question of first impression. It cannot be resolved by analogy to cases that lack the central facts of this dispute.

## II.

### PLAINTIFF HAS PLAUSIBLY ALLEGED DEFAMATION

### A. Claims Related to the First Report Are Not Time-Barred.

Defendants argue that claims arising from the First Report, published September 12, 2024, are barred by the one-year statute of limitations under N.C.G.S. § 1-54(3) and the single publication rule. This argument fails for three independent reasons.

6

First, North Carolina appellate courts have not adopted the single publication rule. Defendants cite Fourth Circuit opinions predicting that other states would adopt the rule, but no North Carolina appellate decision has done so. This Court should decline to predict that North Carolina would adopt a rule that would insulate a publisher's deliberate continued publication of content the publisher knows to be legally nullified.

Defendants' principal authority for the single publication rule is Lokhova v. Halper, 995 F.3d 134 (4th Cir. 2021), which held that hyperlinks and retweets of existing online articles do not constitute republication sufficient to restart the statute of limitations. Id. at 142. Lokhova is distinguishable. The Lokhova court addressed passive third-party sharing of unchanged content—tweets and hyperlinks that did not alter the underlying articles. Here, Plaintiff does not argue that third-party sharing restarted the clock. Plaintiff argues that Defendants' own deliberate continued commercial exploitation of content they have verified references legally nullified charges—on an advertising-supported platform generating ongoing revenue with each page view—constitutes a fundamentally different act than passive archiving. Notably, Judge Quattlebaum wrote separately in Lokhova to observe that a publisher's intentional use of a hyperlink to redistribute prior material for commercial purposes—rather than as a mere citation—could plausibly constitute republication. 995 F.3d at 153–54 (Quattlebaum, J., concurring in part and dissenting in part). WBTV's continued publication is not a passive archive or a third-party retweet; it is a deliberate commercial decision by the original publisher, made with verified knowledge of expungement. Moreover, Lokhova did not involve any post-publication change in the legal status of the underlying events—the articles remained true throughout. Here, the Expungement Order changed the legal character of the content after publication.

Defendants' remaining single-publication-rule authorities—Nationwide Bi-Weekly Admin., Inc. v. Belo Corp., 512 F.3d 137 (5th Cir. 2007); In re Phila. Newspapers, 690 F.3d 161 (3d Cir. 2012); Yeager v. Bowlin, 693 F.3d 1076 (9th Cir. 2012); Firth v. State, 98 N.Y.2d 365 (2002); and Hebrew Acad. of San Francisco v. Goldman, 42 Cal. 4th 883 (2007)—are from other circuits or state courts, are not binding on this Court, and none addresses a post-publication expungement or verified publisher knowledge that underlying proceedings have been nullified.

Second, even under the single publication rule, the continued active commercial publication of the First Report—generating advertising revenue, algorithmically promoted to new readers, appearing as a top Google search result for Dr. Sunar's name in March 2026 (Am. Compl. Ex. D)—differs materially from the "passive hosting of unchanged content" that the rule is designed to protect. Defendants are not merely passively archiving a newspaper edition, but are actively and commercially exploiting content on an advertising-supported digital platform where every page view generates revenue. Defendants' website displays commercial advertisements alongside the articles at issue.

Third, documented harms independently arising within the limitations period support Plaintiff's claims. The Putnam affidavit (March 2025), the Lam affidavit (March 2025), and the Kilcrease communication all describe harm occurring well within one year of the December 10, 2025 filing. (Am. Compl. Exs. E, G, H.)

Fourth, the direction of legislative thinking supports Plaintiff's position. Florida has enacted legislation providing that where a media entity publishes a statement on the Internet and "thereafter receives notice that such statement has been found in a judicial proceeding to be false, or receives notice of facts that would cause a reasonable person to conclude that such statement was false, and fails to take reasonable steps to permanently remove the statement," the continued

8

appearance of the statement "is a new publication for purposes of the statute of limitations, and the owner, licensee, or operator would not be entitled to a fair reporting privilege for such new publication." Fla. CS/HB 757, § 770.04, F.S. While Florida law does not bind this Court, it demonstrates that a major state legislature has recognized that continued publication after notice of falsity constitutes a new publication and extinguishes the fair report privilege—precisely the legal principle Plaintiff advances here. The trajectory of the law—in legislatures and in courts confronting the realities of commercial digital publication—is toward accountability, not insulation.

Fifth, and most fundamentally, Defendants' statute of limitations argument assumes the cause of action accrued on September 12, 2024, when the First Report was published. But Plaintiff's claim is not that the First Report was defamatory when published—Plaintiff acknowledges the report was accurate at that time. Plaintiff's claim is that Defendants' continued publication of the First Report became actionable when the Expungement Order rendered the content legally false on October 10, 2025. A cause of action for publication of legally false content cannot accrue before the content becomes legally false. The expungement process was entirely outside Plaintiff's control—it required six months of court processing after the April 7, 2025 dismissal. Unlike the plaintiff in Morrissey v. William Morrow & Co., 739 F.2d 962 (4th Cir. 1984)—a case Defendants cite through Lokhova for the single publication rule—who had full knowledge of the statute of limitations and "had done nothing to create a factual dispute," id. at 966, Plaintiff here was not idle. Nine days after the charges were dismissed, Plaintiff personally emailed Defendants describing the harm to his practice and employees. (Ex. K.) He left voicemail messages. He retained counsel who contacted Defendants in October 2025. Plaintiff pursued resolution at every opportunity while the court system completed the

expungement process. When the Expungement Order was entered on October 10, 2025, Plaintiff filed suit within sixty-one days. The statute of limitations does not punish a plaintiff for the time the legal system requires to complete the very process that gives rise to his claim—particularly where, as here, Defendants' publication remains live and commercially active as of the date of this filing.

**B. The Reports Are Not "True" in the Legally Relevant Sense After Expungement.**

Defendants argue that truth is a complete defense because the arrest historically occurred. Plaintiff does not dispute that the arrest occurred. The question is whether the *continued present-day publication* of charges that have been expunged—presented as current, searchable content to new readers who encounter them in 2026—constitutes publication of "true" content under North Carolina defamation law.

The charges against Dr. Sunar were voluntarily dismissed without prejudice on April 7, 2025—the State examined the case and declined to pursue it. Dr. Sunar was never tried, never convicted, never given the opportunity to present his defense and obtain public vindication through acquittal. The Expungement Order of October 10, 2025 confirmed what the dismissal demonstrated: there was nothing there. Yet Defendants continue to publish the arrest—the mugshot, the headline, the allegations—as though the charges represent the complete story, weaponizing the absence of a trial by treating the arrest as a permanent, unrebutted fact.

N.C.G.S. § 15A-146 is restorative in purpose and design. After expungement, no person "shall be held thereafter under any provision of any law to be guilty of perjury… by reason of his failure to recite or acknowledge such arrest." The legislature determined that after expungement, charges are treated as if they never occurred. Defendants' continued publication—with verified

knowledge of the expungement—directly undermines the restorative purpose the North Carolina legislature intended.

Defendants' parent company is incorporated in Georgia, whose own record restriction statute, O.C.G.A. § 35-3-37, similarly provides that persons whose records are restricted may state that the record does not exist. Defendants cannot credibly claim ignorance about what expungement means when their own home state's law embraces the same restorative principle.

The expungement statute does not compel Defendants to remove their publications. But it defines the legal landscape in which this Court evaluates the defamation claim. When a reader Googles Dr. Sunar's name today and sees "Charlotte dentist charged with child abuse," the present-tense communicative impact is a statement about charges that, under North Carolina law, do not exist. Whether this communicative impact constitutes actionable falsity is a question of first impression that cannot be resolved on a motion to dismiss by simply asserting the article was accurate when originally published.

**C. The Fair Report Privilege Does Not Protect Continued Publication After Verified Knowledge of Expungement.**

Defendants invoke the fair report privilege, which protects substantially accurate reports on official proceedings. *See Desmond v. News & Observer Publ'g Co.*, 241 N.C. App. 10, 25 (2015). Plaintiff acknowledges the First Report was a substantially accurate report of official records when published on September 12, 2024.

But the privilege requires good faith. After October 10, 2025, when the Expungement Order was entered, and after Defendants verified the expungement through the Bonilla email, Defendants were no longer "reporting on official proceedings." The official proceedings had been nullified by court order, and Defendants knew it. Continued publication of content

referencing proceedings the publisher knows have been legally erased is not a "report" on official actions—it is independent assertion of facts the publisher knows are legally nonexistent.

The Bonilla email destroys any claim of good faith. Bonilla wrote: "We've been able to verify that the charges have been expunged." Verification is knowledge, not editorial judgment. When a publisher verifies that the legal system has declared certain charges nonexistent and continues to publish those charges, the fair report privilege is extinguished. *See* Am. Compl. Ex. B (ECF 13-1 at 8-9).

Defendants argue that if the expungement statute imposed obligations on media publishers, this would constitute an unconstitutional prior restraint. (Defs.' Br. at 13 (citing Bartnicki v. Vopper, 532 U.S. 514, 528 (2001)).) This argument attacks a claim Plaintiff does not make. The Amended Complaint voluntarily narrowed Plaintiff's claims by dropping any cause of action under the NC expungement statute itself. Plaintiff does not contend that N.C.G.S. § 15A-146 compels Defendants to remove their publications or that the statute "gags" third-party news outlets. Plaintiff brings common law defamation claims in which the expungement order informs the analysis of falsity and actual malice—not a statutory violation claim. Defendants' prior restraint argument is directed at a claim that does not exist in this case.

**D. The Second Report Carries Defamatory Meaning.**

Defendants argue the Second Report cannot carry defamatory meaning because it states the charges were "cleared." This argument treats the Second Report as a sealed document read in isolation. In reality, the Second Report functions as a gateway to the First Report.

The Second Report's headline—"Charges dropped against Charlotte dentist accused of child abuse in 2024"—reintroduces the accusation of child abuse to every new reader who encounters it in a Google search. The body republishes the specific allegations of the expunged

charges, including that Dr. Sunar allegedly "inflicted physical injury on a child younger than 16 years old." A reader encountering this headline is not reassured—the reader is prompted to investigate further, at which point the reader discovers the First Report, complete with mugshot and detailed allegations.

The marketplace of readers has already answered the question Defendants ask this Court to resolve. Following publication of the Second Report and its indexing by Google, Dr. Bicuspid—a nationally circulated professional dental publication—republished the story to a nationwide audience of dental professionals. (Am. Compl. Ex. J.) Dr. Bicuspid did not run this story because a dentist was exonerated. It ran the story because a dentist was accused of child abuse. The editorial judgment of a professional publication confirms what the plain text makes clear: the communicative impact of the Second Report is the accusation, not the resolution. The reactions of Dr. Bicuspid's own readers further corroborate this conclusion. Within hours of publication, one dental professional commented: "why repeat the allegations at the end if nothing more is happening on this case?" Another wrote: "Why don't you put what the findings were instead of still slanting the story towards an unfounded allegation." (Am. Compl. Ex. J.) These are not Plaintiff's characterizations—they are the independent reactions of reasonable readers in Plaintiff's own professional community, recognizing that the Second Report's framing conveys accusation, not exoneration. If Defendants contend that no reasonable reader would understand the Second Report to carry defamatory meaning, the actual readers of the Second Report disagree.

Defendants themselves cite Nobles v. Boyd, 2015 WL 2165962, at *6 (E.D.N.C. May 8, 2015), which holds that defamatory meaning is determined from "the standpoint of the average reader" and not "by its effect when subjected to the critical analysis of a mind trained in the law."

That standard governs here. Defendants' argument that the Second Report is not defamatory rests on a lawyer's parsing of the article's body text—noting that the words "cleared," "dropped," and "expunged" appear. But the average reader does not parse text like a lawyer. The average reader sees a headline associating a dentist with child abuse, reads the republished allegations, and forms an impression. The Dr. Bicuspid commenters—average readers in Plaintiff's own professional community—demonstrated exactly this response. Under the standard Defendants' own authority establishes, the question of defamatory meaning must be assessed through an average reader's eyes, not through the lens of a legal brief.

Furthermore, Defendants offered Plaintiff "a new article that states the outcome of the case." What Defendants published was an article that restates the original accusations in detail, without sharing a draft or seeking any input from Plaintiff or his attorney on the framing. The gap between what was offered and what was published—and Defendants' unilateral decision to publish without review—supports an inference of defamatory intent, or at minimum raises a factual question that precludes dismissal.

Defendants characterize the Second Report as published "at Plaintiff's behest" and note that Plaintiff's attorney "thanked" WBTV after publication. (Defs.' Br. at 8 n.6.) This framing omits critical context. What Plaintiff's attorney accepted was the offer of "a new article that states the outcome of the case." The "thank you" preceded Plaintiff's review of the actual content and headline framing. When Plaintiff subsequently reviewed what Defendants had published—a sensationalized republication leading with "accused of child abuse" and repeating the specific warrant allegations—he objected and renewed his request for removal. That Defendants secured preliminary agreement to publish an update does not immunize the editorial choices they made in

14

framing it. A patient who consents to a dental procedure does not consent to malpractice in its execution.

Defendants also cite Fourth Circuit authority on defamatory meaning to argue the Second Report cannot be actionable. In Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1092–93 (4th Cir. 1993), the court held that a defamation-by-implication plaintiff must make "an especially rigorous showing where the expressed facts are literally true," and that "the language must not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." Id. at 1093. But the Chapin standard cuts in Plaintiff's favor. WBTV's Second Report headline—"Charges dropped against Charlotte dentist accused of child abuse in 2024"—leads with the accusation, not the exoneration. The body republishes the specific warrant allegations. WBTV's editorial choice to frame the headline around the accusation rather than the resolution affirmatively suggests that WBTV intended the reader to absorb the accusation. Dr. Bicuspid's republication of the story to a national dental audience confirms this communicative reality. Unlike Chapin, where the article reported substantially true facts without endorsing any defamatory implication, WBTV's headline structure affirmatively endorses the association between Dr. Sunar's profession and child abuse.

In Harvey v. CNN, Inc., 48 F.4th 257, 270–72 (4th Cir. 2022), the court dismissed defamation claims because the statements at issue described the plaintiff's attendance at meetings and role as a subordinate—inherently neutral facts that the plaintiff tried to imbue with defamatory meaning through inference. Harvey is inapposite. The Second Report does not describe neutral conduct requiring inference to reach a defamatory meaning. It explicitly associates a healthcare professional by name and profession with child abuse in its headline. A

parent searching for a dentist for their child who encounters "Charlotte dentist accused of child abuse" does not need to draw any inference. The defamatory meaning is on its face.

Defendants further cite Mac Isaac v. Politico LLC, 346 A.3d 103, 118 (Del. 2025), for the proposition that a headline constitutes a "fair index" of an accurate article. Mac Isaac is a Delaware Supreme Court opinion applying Delaware law and is not binding on this Court. More fundamentally, Mac Isaac is factually inapposite. The Politico headline in Mac Isaac did not name the plaintiff at all—readers would have had to consult external sources to connect the plaintiff to the headline. Here, the Second Report names Dr. Sunar by profession in the headline and by name in the article body. The "of and concerning" element that was fatal to the plaintiff in Mac Isaac is not in dispute here. And unlike the Mac Isaac headline, which the court found was a "fair index" of a substantially accurate article, WBTV's headline leads with the accusation and subordinates the exoneration—precisely the opposite of a fair index.

### E. Actual Malice Is Plausibly Alleged.

Defendants relegate the actual malice discussion to a footnote, asserting that because the publications are "true," actual malice is irrelevant. But as set forth above, truth is the contested issue. And the Bonilla email establishes knowledge sufficient to support a plausible inference of actual malice under *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

As a threshold matter, Dr. Sunar is a private figure—a dentist, not a public official or celebrity. Under Gertz v. Robert Welch, Inc., 418 U.S. 323, 344-45 (1974), private individuals deserve greater protection because they have fewer opportunities for rebuttal. Dr. Sunar attempted self-help—personal emails, voicemails, attorney communications—and was ignored at every turn. Under Gertz and North Carolina law, as a private figure Plaintiff need only show

16

negligence, not actual malice. See Neill Grading & Constr. Co., Inc. v. Lingafelt, 168 N.C. App. 36, 46 (2005). Nevertheless, the evidence here supports actual malice as well.

Dr. Sunar's efforts to resolve this matter without litigation span over thirteen months. On April 16, 2025—nine days after the voluntary dismissal of all charges—Dr. Sunar personally emailed Defendants, describing the harm the First Report was causing to his dental practice and to the employees whose livelihoods depend on it. (Ex. K.) Defendants did not respond. Dr. Sunar also left voicemail messages at Defendants' general mailbox. Defendants did not respond.

When Dr. Sunar's attorney contacted Defendants in October 2025, Defendants acknowledged receipt, independently verified the expungement, and refused removal. Defendants then published the Second Report—republishing the expunged allegations under a sensationalized headline—without sharing a draft with Dr. Sunar or his attorney. When Dr. Sunar wrote again on November 26, 2025, requesting removal of all publications, Defendants' counsel rejected the request and asserted that any legal claim would lack merit. Am. Compl. 47; id. Ex. B (ECF 13-1 at 5-6).

Notably, the December 1, 2025 letter was not issued by a newsroom editor exercising routine editorial discretion. It was issued by Defendants' counsel, Lauren P. Russell of Ballard Spahr LLP—an attorney whose practice focuses on media and entertainment litigation and who previously served as an associate producer at CNN. Ms. Russell's letter ratified the editorial decision made by Defendants' News Director at the level of sophisticated media litigation counsel. This transforms the decision to continue publishing from a newsroom judgment call into a deliberate, legally counseled corporate decision made with full awareness of the expungement, the applicable law, and the specific harm Plaintiff had communicated. Defendants cannot characterize continued publication as a good-faith editorial decision when that decision was

17

reviewed, endorsed, and defended by expert media counsel who understood precisely what was at stake.

At every decision point over thirteen months, Defendants were informed of specific, concrete harm—including harm to employees who depend on Dr. Sunar's practice—and at every point Defendants chose continued publication. This documented pattern of notice and deliberate indifference supports a plausible inference of actual malice. Defendants cite *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989), for the proposition that profit motive alone does not establish actual malice. But Plaintiff does not allege profit motive alone. Plaintiff alleges profit motive combined with verified knowledge of expungement, combined with thirteen months of documented notice of harm, combined with deliberate refusal to remove, combined with a competitor's removal of identical content in five days. Whether this cumulative course of conduct constitutes actual malice is, at minimum, a question for discovery.

Indeed, the very case Defendants cite supports Plaintiff's position. In *Harte-Hanks*, the Supreme Court held that "although failure to investigate will not alone support a finding of actual malice . . . the purposeful avoidance of the truth is in a different category." 491 U.S. at 692. The Court found actual malice where a newspaper made "a deliberate decision not to acquire knowledge of facts that might confirm the probable falsity" of the published statements. *Id.* Plaintiff's case is stronger than *Harte-Hanks*. There, the newspaper avoided learning the truth. Here, Defendants *learned* the truth—Bonilla verified the expungement—and continued publishing anyway, a decision ratified by Defendants' own counsel. If purposeful avoidance of truth supports a finding of actual malice, then purposeful disregard of verified truth compels one.

Notably, Defendants themselves cite Desmond v. News & Observer Publ'g Co., 241 N.C. App. 10 (2015), for the fair report privilege. But Defendants omit the rest of that case's history.

On remand, the case proceeded to trial, and the jury found actual malice and awarded $6 million in damages against the News & Observer. The North Carolina Supreme Court affirmed that the plaintiff presented sufficient evidence of actual malice by clear and convincing evidence. Desmond v. News & Observer Publ'g Co., 375 N.C. 21, 846 S.E.2d 647 (2020). The Court found actual malice where the newspaper's "primary objective was sensationalism rather than truth." Desmond v. News & Observer Publ'g Co., 263 N.C. App. 26, 67, 823 S.E.2d 412, 431 (2018). That is precisely the inference raised here. WBTV was offered the opportunity to simply report the outcome—that Dr. Sunar was cleared. Instead, it published a headline leading with "accused of child abuse," republished the specific warrant allegations, and framed the article so that the accusation dominated the exoneration. And rather than replace the First Report, Defendants published the Second Report alongside it—leaving both commercially active. Two dental professionals who read the resulting Dr. Bicuspid republication independently recognized this as sensationalism: one asked why the allegations were repeated "if nothing more is happening," and another called it "slanting the story towards an unfounded allegation." Whether WBTV's editorial choices reflect the same prioritization of sensationalism over truth that the jury found in Desmond is a question for discovery and ultimately for the finder of fact—not for dismissal on the pleadings.

North Carolina's own retraction statute, N.C.G.S. § 99-2, further supports this inference. The statute provides that a newspaper's good-faith retraction may limit liability for punitive damages. Defendants did not retract. They did not correct. They did not annotate. They did not even acknowledge the expungement on the face of the article. The statute exists to incentivize responsible conduct after publication. Defendants' complete failure to take any corrective action—after verified knowledge of expungement and thirteen months of notice—removes any

protection the statute might otherwise have offered and supports the inference that Defendants acted with malice.

Defendants' posture at the settlement conference was consistent with their litigation conduct. Defendants filed their initial Motion to Dismiss (ECF 8) without conducting the settlement conference required by this Court's Standing Order, necessitating Plaintiff's Motion to Enforce. The Court then structured its subsequent order to require the conference as a precondition to refiling. When compelled to participate on March 12, 2026, Defendants' counsel acknowledged she was not authorized to make any settlement proposal. Defendants offered nothing—no removal, no annotation, no de-indexing, no monetary offer. Their sole proposal was that Plaintiff voluntarily dismiss his case, with the alternative being attorney fee recovery. From violating this Court's Standing Order, to attending without settlement authority, to offering only threats, Defendants have at no point demonstrated willingness to engage in the good-faith resolution process this Court requires.

### III.

### THE ANCILLARY CLAIMS INDEPENDENTLY SURVIVE

#### A. The Claims Are Not Mere "End-Runs" Around Defamation.

Defendants argue under *Food Lion, Inc. v. Capital Cities/ABC, Inc.*, 194 F.3d 505, 522 (4th Cir. 1999), that Plaintiff's ancillary claims are repackaged defamation claims subject to the same defenses. But *Food Lion* involved claims that were entirely derivative of the defamation theory. Moreover, the district court in Food Lion found that "it was Food Lion's food handling practices themselves—not the method by which they were recorded or published—which caused the loss of consumer confidence." 964 F. Supp. 956, 963 (M.D.N.C. 1997). Food Lion's

reputational harm came from its own conduct—the unsafe practices were real. Here, there are no underlying practices causing harm. The charges were dismissed, the State declined to prosecute, and the record was expunged. Dr. Sunar has served the Charlotte community for 24 years with a practice built on patient trust. The sole source of reputational harm is WBTV's continued publication of legally nullified charges. That is not an end-run around defamation—it is defamation. The tortious interference claims are further supported by independent evidence that goes beyond the defamatory content to show concrete interference with specific, identified business relationships and prospective economic opportunities.

The Kilcrease communication (Am. Compl. Ex. E) establishes that a professional recruiter identified the WBTV article as the specific reason associate candidates would not join Dr. Sunar's practice. The Raphun email chain (Am. Compl. Ex. F) establishes that an attorney excluded Dr. Sunar from a business arrangement "because of the optics." These are not generalized reputational harms—they are specific, identified instances of interference documented by third parties who independently attributed their decisions to the article. Defendants do not address either Kilcrease or the Raphun email in their brief.

### B. Tortious Interference Is Plausibly Alleged.

Defendants argue that publishing truthful information cannot constitute tortious interference, citing *Worldwide Primates, Inc. v. McGreal*, 26 F.3d 1089, 1092 (11th Cir. 1994). But truth is the contested issue in this case. And even under Defendants' framing, the element of justification is a factual question. What is the justification for continued publication of expunged charges when the publisher has verified the expungement and a competitor removed identical content? Defendants also cite Ballengee v. CBS Broadcasting, Inc., 331 F. Supp. 3d 533, 555 (W.D. Va. 2018), aff'd, 968 F.3d 344 (4th Cir. 2020), where the court dismissed tortious

interference claims because the CBS broadcast was true. But Ballengee did not involve a publisher who verified that the underlying facts had been legally nullified and continued publishing. Truth is the threshold question, and it is contested here.

Defendants characterize the Putnam and Lam affidavits as evidence of no harm because both patients ultimately sought care. (Defs.' Br. at 6, 20 n.7.) This inverts the logic. These affidavits demonstrate that the First Report actively deters prospective patients who encounter it. Putnam and Lam are patients who discovered the First Report only after establishing a relationship with Plaintiff—and even then, required reassurance to continue treatment. They represent the narrow category of patients Plaintiff had the opportunity to retain. The far larger category—prospective patients who encounter the article before ever contacting Plaintiff's practice and simply choose a different provider—cannot be quantified at the pleading stage. This is precisely why discovery exists.

The interference extends well beyond patient acquisition. As alleged in the Amended Complaint, Dr. Sunar was excluded from a significant business venture with substantial equity value—potentially worth hundreds of millions of dollars—when the opposing party's attorney cited the WBTV article as the basis for exclusion, stating the decision was made "because of the optics." (Am. Compl. ¶¶ 66-69; id. Ex. F.) This is not an attenuated causal chain. It is a documented, specific instance in which a sophisticated legal professional identified the WBTV article by name as the reason for excluding Dr. Sunar from a business relationship. Defendants do not address Exhibit F in their brief.

Defendants argue in footnote 7 that Plaintiff failed to plead Defendants' knowledge of these specific contracts. But this argument conflates two distinct torts. For tortious interference with prospective economic advantage (Count VI), Plaintiff need not allege that Defendants knew

22

of any specific contract. He must allege that Defendants' unjustified conduct interfered with his ability to attract future business. *See Walker v. Sloan*, 137 N.C. App. 387, 393, 529 S.E.2d 236, 242 (2000). The Kilcrease communication, the Raphun email, the patient affidavits, and the Google screenshots collectively establish that the First Report is actively and continuously interfering with Dr. Sunar's prospective economic relationships across multiple dimensions—patient acquisition, associate recruitment, professional referrals, and business ventures.

Unlike the plaintiffs in Defendants' cited authorities, Dr. Sunar has operated dental practices in the Charlotte community for over 24 years, employing clinical staff, administrative personnel, and associate dentists whose livelihoods depend directly on the continued viability and reputation of the practice. The ongoing publication of an article linking Dr. Sunar's name and profession to child abuse charges threatens not only his reputation but the economic foundation of a healthcare practice that provides employment and dental care to the Charlotte community. At the 12(b)(6) stage, Plaintiff need not prove damages with mathematical precision. He must plausibly allege that Defendants' conduct caused actual harm. Two patient affidavits, a recruiter's communication, an opposing attorney's admission, and Google search results demonstrating the article's continued prominence more than satisfy that threshold.

### C. The Emotional Distress Claims Are Supported by a Pattern of Conduct.

Plaintiff acknowledges that the IIED and NIED claims face a higher threshold. However, the conduct at issue is not a single editorial decision—it is a thirteen-month pattern: personal pleas ignored, expungement verified and disregarded, a second article published that republished expunged allegations without the subject's input, and a legal threat against a pro se plaintiff who sought only the removal of legally nullified content. Whether this cumulative pattern rises to the

level of "outrageous conduct" under *Briggs v. Rosenthal*, 73 N.C. App. 672, 677 (1985), is a question more appropriately reserved for a fully developed factual record. At minimum, these claims should survive to discovery, where the full scope of Defendants' internal communications and decision-making can be evaluated.

## IV.

## DISMISSAL WITH PREJUDICE IS NOT WARRANTED

Defendants request dismissal with prejudice, asserting that "any further amendment would be futile." (Defs.' Br. at 20.) This is the Amended Complaint. Pro se plaintiffs are entitled to liberal construction of their pleadings and, where deficiencies exist, the opportunity to amend. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007). If this Court identifies specific deficiencies in any of Plaintiff's claims, Plaintiff respectfully requests leave to amend rather than dismissal with prejudice.

## CONCLUSION

The Bonilla email establishes that Defendants verified the expungement. Queen City News establishes that responsible media outlets in the same market removed identical content. The April 16, 2025 email establishes that Defendants were personally informed of specific harm to Dr. Sunar's practice and employees months before the expungement occurred. The Putnam and Lam affidavits, the Kilcrease communication, the Raphun email, and the Dr. Bicuspid republication establish concrete, documented, and ongoing harm. The Google screenshots establish that the article continues to dominate search results for Dr. Sunar's name.

Dr. Sunar has served the Charlotte community for 24 years. He is the father of two young daughters. He employs staff whose families depend on his practice. He did not want to be in this

24

courtroom. He spent thirteen months—through personal emails, voicemails, attorney communications, and written demands—trying to resolve this matter without litigation. Defendants are a $7 billion publicly traded corporation whose cost of removing one archived article from its website would have been zero. Instead, Defendants' response to thirteen months of pleas from a father, a healthcare provider, and a small business owner was silence, refusal, sensationalized republication, violation of this Court's Standing Order, and threats of countersuit.

Defendants characterize this as Plaintiff's second failed attempt to state a claim. That is misleading. Plaintiff filed in North Carolina Superior Court; Defendants removed to this Court on diversity grounds, then filed a Motion to Dismiss in violation of this Court's Standing Order, which was denied as moot. This Court granted leave to amend, and Plaintiff filed the Amended Complaint pursuant to that grant. From any practical standpoint, this is Plaintiff's first amended pleading in federal court. That Defendants' counsel "repeatedly communicated" her view that these claims lack merit is unremarkable; what is remarkable is that in those very communications, Defendants verified the expungement, refused removal, and threatened countersuit—thereby creating the evidentiary record for the claims they now ask this Court to dismiss.

The full scope of Defendants' knowledge, intent, and decision-making can only be determined through discovery. Plaintiff respectfully requests that this Court deny Defendants' Motion to Dismiss and permit this case to proceed.

Dated: _April 9th_, 2026

Respectfully submitted,

25

Dr. Ramesh K. Sunar, DMD

Pro Se Plaintiff

2809 Coltsgate Road, Ste. 210

Charlotte, NC 28211

Tel: (704) 957-5938

Email: rsunar@yahoo.com

## CERTIFICATION REGARDING USE OF ARTIFICIAL INTELLIGENCE

Pursuant to the Standing Order of this Court regarding the use of artificial intelligence in the preparation of briefs and memoranda, the undersigned certifies as follows:

Artificial intelligence tools were used in the preparation of this brief for research assistance and drafting. All case citations, legal authorities, and factual representations contained in this brief have been independently verified by the undersigned through primary legal research sources. The undersigned takes full responsibility for the accuracy of all citations and representations made herein.

Dr. Ramesh K. Sunar, DMD

Pro Se Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on *April 9th*, 2026, the foregoing was served on Defendants' counsel via email and U.S. mail, addressed as follows:

Lauren P. Russell

Ballard Spahr LLP

1909 K Street NW, 12th Floor

Washington, DC 20006

russelll@ballardspahr.com

Dr. Ramesh K. Sunar, DMD

27